No. 23-6019

---

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**ARIEL SCHLOSSER**
*Plaintiff/Appellee*

v.

**VRHABILIS, LLC**
*Defendant/Appellant*

---

On appeal from the United States District Court
for the Eastern District of Tennessee, at Chattanooga
Case No. 3:20-cv-00190-TRM-JEM

---

**BRIEF OF DEFENDANT/APPELLANT
VRHABILIS, LLC**

---

George R. Arrants, Jr.
Bryce E. Fitzgerald
Kramer Rayson LLP
Post Office Box 629
Knoxville, TN 37901-0629
865-525-5134
garrants@kramer-rayson.com
bfitzgerald@kramer-rayson.com


Attorneys for Defendant/Appellant
VRHabilis, LLC

## CORPORATE DISCLOSURE STATEMENT

Appellant, VRHabilis, LLC, makes the following disclosures as required by Sixth Circuit Rule 26.1:

1.    Are said parties a subsidiary or affiliate of a publicly owned corporation? If yes, list the identity of the parent corporation or affiliate and the relationship between it and the named party.

No.

2.    Is there a publicly owned corporation, not a party to the appeal that has a financial interest in the outcome?

No.

By:/s/ Bryce E. Fitzgerald
George R. Arrants, Jr.
Bryce E. Fitzgerald
Kramer Rayson LLP
Post Office Box 629
Knoxville, TN 37901-0629
865-525-5134
garrants@kramer-rayson.com
bfitzgerald@kramer-rayson.com
*Attorneys for Defendant/Appellant*
***VRHabilis, LLC***

i

# Table of Contents

Corporate Disclosure Statement .............................................................. i

Table of Authorities ...................................................................... iv

Statement Regarding Oral Argument ........................................................1

Statement of Subject Matter and Appellate Jurisdiction .........................................1

Statement of Issues.....................................................................1

Statement of the Case...................................................................2

A.  Procedural History...................................................................2

B.  Factual Background ..................................................................3

    1.  VRHabilis, LLC Background............................................3

    2.  Cape Poge Project.......................................................5

    3.  Schlosser's Employment. ................................................6

    4.  VRH's Employment Policies. ...........................................10

    5.  Tyler Sanders...........................................................11

    6.  Aaron Brouse...........................................................15

    7.  Schlosser's Resignation.................................................18

Summary of the Argument...............................................................19

Standard of Review ....................................................................21

Argument...............................................................................22

A.  VRH Is Entitled To Judgment As A Matter Of Law On Schlosser's Hostile Work Environment Claims..................................................................22

B.  The District Court Erred in Considering Other Actions as Harassing Conduct Under the Totality of the Circumstances.........................................................23

C.  No Evidence Supports Schlosser's Claim of Hostile Work Environment by Tyler Sanders. ......................................................................24

    1.  Schlosser Presented No Evidence of Harassment By Sanders *Based On Sex.*.......................................................................24

    2.  Schlosser Presented No Evidence of Severe or Pervasive Discriminatory Harassment by Sanders. ..................................30

    3.  VRH Cannot be Liable for a Hostile Work Environment by Sanders Under the Faragher/Ellerth Affirmative Defense...................................32

D.  No Evidence Supports Schlosser's Claim of Hostile Work Environment by Aaron Brouse. ...................................................................................40

    1.  Brouse's Conduct was not Severe or Pervasive. .....................................40

    2.  Schlosser failed to offer sufficient evidence at trial that VRH "knew or should have known" of the alleged harassment by Brouse and did not take corrective action. ...................................................43

Conclusion ...........................................................................................................46

Certificate of Compliance ....................................................................................47

Certificate of Service ...........................................................................................48

Designation of the Relevant District Court Documents .......................................50

## TABLE OF AUTHORITIES

**CASES**

*Barnette v. Dep't of Veterans Affairs,* 153 F.3d 338, 343 (6th Cir. 1998)........ 25, 29

*Blankenship v. Parke Care Ctrs., Inc.,* 123 F.3d 868, 873 (6th Cir. 1997)............43

*Bowman v. Shawnee State Univ.,* 220 F.3d 456, 464 (6th Cir. 2000) .. 25, 27, 28, 30

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998) .......................... 32, 33

*Burnett v. Tyco Corp.,* 203 F.3d 980 (6th Cir. 2000) ...............................................41

*Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 348 (6th Cir. 2005) ...... 22, 34, 41

*Collette v. Stein-Mart, Inc.,* 126 F. App'x 678, 685 (6th Cir. 2005) ............... 35, 38

*Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 836 (6th Cir. 1996) ......................29

*Deters v. Rock–Tenn Co., Inc.,* 245 Fed. Appx. 516, *525 (6th Cir. 2007) ............34

*Doe v. City of Detroit, Michigan,* 3 F.4th 294, 301 (6th Cir. 2021) .......................43

*Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)....................... 31, 32, 33

*Fleenor v. Hewitt Soap Co.,* 81 F.3d 48, 49 (6th Cir. 1996) ..................................41

*Goller v. Ohio Dep't of Rehab. & Corr.,* 285 Fed. Appx. 250 (6th Cir. 2008) .......32

*Graves v. Dayton Gastroenterology, Inc.,* 657 F. App'x 485, 488 (6th Cir. 2016) 24

*Gwen v. Reg'l Transit Auth.,* 7 Fed. Appx. 496, 502 (6th Cir. 2001) .....................41

*Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999)..................................... 22, 23

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) ...............................................31

*Harris v. Sodders,* No. 07-4398, 2009 WL 331633, at *2 (6th Cir. Feb. 11, 2009)39

iv

*Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 338 (6th Cir. 2008) ...................43

*Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 262 (5th Cir. 1999)................39

*Jackson v. Quanex Corp.,* 191 F.3d 647, 663 (6th Cir. 1999)...............................43

*Oncale v. Sundowner Offshore Servs., Inc.* 523 U.S. 75, 80 (1998) ............... 29, 40

*Phillips v. UAW Int'l,* 854 F.3d 323, 328 (6th Cir. 2017) .......................................23

*Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 733 (6th Cir. 2006)..........22

*Stokes v. Ohio Truck Sales, LLC,* No. 3:21-CV-00371-JGC, 2022 WL 4599254, at

  *7 (N.D. Ohio Sept. 30, 2022) ............................................................................30

*Swenson v. Potter,* 271 F.3d 1184, 1193 (9th Cir. 2001) .......................................38

*Trepka v. Bd. of Educ.,* 28 Fed. Appx. 455, 461 (6th Cir. 2002)............................32

*Vance v. Ball State Univ.,* 570 U.S. 421, 424 (2013) .............................................33

*Waldo v. Consumers Energy Co.,* 726 F.3d 802, 814 (6th Cir. 2013)........ 38, 43, 45

*Wasek v. Arrow Energy Servs., Inc.,* 682 F.3d 463, 467 (6th Cir. 2012) ...............30

*West v. Tyson Foods, Inc.,* 374 F. App'x 624, 633 (6th Cir. 2010) ........................43

*White v. Coventry Health & Life Ins. Co.,* 680 F. App'x 410, 415-16 (6th Cir. 2017)

  ...........................................................................................................................29

*Williams v. GMC,* 187 F.3d 553 (6th Cir. 1999) ............................................ 26, 27

*Wyatt v. Nissan N. Am., Inc.,* 999 F.3d 400, 412 (6th Cir. 2021) ...........................32

**STATUTES**

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. § 1343 ........................................................................................1

42 U.S.C. § 2000e-2 ...................................................................................2

42 U.S.C. § 2000e-5 ...................................................................................1

**RULES**

Fed. R. Civ. P. 50 ......................................................................................3

### STATEMENT REGARDING ORAL ARGUMENT

Defendant/Appellant VRHabilis, LLC ("VRH") respectfully submits that oral argument is unnecessary. All the issues raised on appeal will be briefed extensively and it is unlikely that oral argument will provide substantial assistance to the panel assigned to the appeal.

### STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court exercised jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(2). This Court has jurisdiction to hear the appeal pursuant to 28 U.S.C. § 1291 because it arises from a final judgment of the United States District Court for the Eastern District of Tennessee, which was entered on March 21, 2023, (R. 76, Judgment, PageID #: 2931), and a Memorandum Opinion denying VRH's Motion for Judgment as a Matter of Law on October 18, 2023. (R. 96, Mem. Op., PageID# 3878.) VRH filed a timely notice of appeal on November 11, 2023. (R. 97, Notice of Appeal, PageID#: 3879.)

### STATEMENT OF ISSUES

1.      Whether the district court erred in denying judgment as a matter of law on Plaintiff/Appellee Ariel Schlosser's hostile work environment claim.

**STATEMENT OF THE CASE**

## A. Procedural History

On, April 29, 2020, Plaintiff/Appellee Ariel Schlosser ("Schlosser") filed a Complaint against VRHabilis, LLC ("VRH") in the Eastern District of Tennessee for Sex Discrimination, Hostile Work Environment, and Retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). (R. 1, Compl., PageID#: 1-14.)

The case was tried before a jury commencing February 21, 2023, and ending March 1, 2023. (R. 55, Min. Entry, PageID#: 1404; R. 70, Min. Entry, PageID#: 2872.) At the close of proof, but before the jury returned its verdict, VRH made an oral Motion for Judgment as a Matter of Law on Schlosser's hostile work environment and retaliation claims, and the Court took the motion under advisement. (R. 76, Judgment, PageID#: 2931.)

The jury rejected many of Schlosser's claims, finding that VRH did not subject Schlosser to discrimination because of her sex or gender, and did not retaliate against her for engaging in a protected activity. (R. 72, Verdict, PageID#: 2880-83.) The jury found in Schlosser's favor on the hostile work environment claim and awarded her $58,170.00 in back pay. (*Id.*)

2

On March 21, 2023, the District Court entered judgment in favor of Schlosser on the hostile work environment claim and denied VRH's Motion for Judgment as a Matter of Law. (R. 76, Judgment, PageID#: 2931.) On April 18, 2023, VRH filed a timely Renewed Motion for Judgment as a Matter of Law under Fed. R. Civ. P. 50(b). (R. 78 & 79, Renewed Mot. & Mem., PageID#: 2951-2970.) Schlosser filed a timely response (R. 83, 84, Resp. & Mem., PageID#: 3035-50), and VRH filed a timely Reply. (R. 86, Reply, PageID#: 3092.) On April 15, 2023, the District Court ordered that the parties may submit replies or supplemental briefs containing citations to trial testimony. (R. 88, Order, PageID#: 3118.) The Parties timely submitted revised and supplemental briefs. (R. 93, VRH Revised Mem., PageID#: 3818-37; R. 94, VRH Revised Reply, PageID#: 3838-50; R. 95, Pl. Supp. Mem., PageID#: 3851-3869.)  The District Court denied VRH's Renewed Motion on October 18, 2023. (R. 96, Mem. Op., PageID#: 3878.) This appeal followed.

### B. Factual Background

#### 1. VRHabilis, LLC Background.

VRH was founded by two navy veterans with the principal objective to provide meaningful employment opportunities for veterans. (R. 91, Tr. 2/23/23 PageID#: 3642.) VRH engages in underwater unexploded ordnance ("UXO") remediation, range and land UXO remediation and underwater

3

construction/demolition, which requires underwater surface-air-supplied diving, where divers wearing a weighted diving suit extract UXO from the bottom of the sea floor. (R. 91, Tr. 2/23/23 PageID#: 3527.)

Elliott Adler ("Adler") is an owner and Chief Operating Officer ("COO") of VRH. (R. 91, Tr. 2/23/23, PageID#: 3570.) He is a Navy veteran who spent over twenty-two years in service, with experience as a fully qualified Navy mixed-gas salvage and repair diver, as well as being a master explosive ordnance disposal technician, and naval parachutist. (*Id.* PageID#: 3639.) In his final post, Adler was a Navy Master Training Specialist in a high-risk training environment at Recruit Training command Great Lakes where he trained approximately 55,000 recruits per year. (*Id.*)  In that role, he received training on how to handle complaints of harassment and discrimination and to conduct investigations. (R. 91, Tr. 2/23/23, PageID#: 3582-83.)

 VRH's Diving Program Manager is Scott Alogna ("Alogna"). (R. 90, Tr. 2/22/23, PageID#: 3452.) He is a Navy veteran who spent over twenty-one years in the Navy, including time as a saturation master diver and seven years as a high-risk diving instructor  to over one thousand Navy divers. (R. 91, Tr. 2/23/23, PageID#: 3525-26.) The Project Manager for the Cape Poge Project was Ronald Madden ("Madden"). (R. 92, Tr. 2/27/23, PageID#: 3687.) He is an Air Force veteran, who

4

had over ten years of experience performing explosive ordnance disposal. (*Id.* PageID#: 3688.) VRH's HR Manager is Diane Backes ("Backes"). (R. 90, Tr. 2/22/23, PageID#: 3352.)

### 2. Cape Poge Project.

In 2016, VRH began a UXO remediation project at Cape Poge, which is part of Chappaquiddick, an Island adjacent to Martha's Vineyard. (R. 91 Tr. 2/23/23, PageID#: 3643.) This site was previously used in World War II to train pilots how to fly and attack an island target with an Avenger dive bomber. (*Id.*) The federal government created a fund to remove any practice bombs and other ordnance items that remained and presented a risk to the public around Cape Poge. (*Id.* PageID#: 3644.)

VRH designated the Cape Poge Project as a production-based project, meaning that VRH was awarded on a fixed-price bid to perform a certain amount of work in a defined area on a very tight timeline. (R. 91, Tr. 2/23/23, PageID#: 3652.) The project was often behind schedule regarding time for VRH's performance due to challenges to the amount of UXO recovered, weather delays and other subcontractor delays, for which VRH management constantly had to increase UXO recoveries in the remaining project time. (R. 91, Tr. 2/23/23, PageID#: 3594; R. 92, Tr. 2/27/23, PageID#: 3797.)

VRH utilized two dive teams on the Project, operating from a boat and with another operating from the shore. (R. 90, Tr. 2/22/23, PageID#: 3261.) During VRH UXO dive projects, a Dive Supervisor ("DS") oversees the diving team, keeping a minute-by-minute log of activity. (R. 90, Tr. 2/22/23, PageID#: 3459.)

In addition to the DS, a dive team is staffed with a standby diver tender, the standby diver, the primary diver, and the primary diver tender. (R. 91, Tr. 2/23/23, PageID#: 3528.) The primary diver is in the water removing the UXO; the standby diver is ready to render assistance to the primary diver if needed; and the diver tender supports the diver in the water by tending the umbilical air-supply hose and maintaining awareness of the diver's location and condition. (R. 91, Tr. 2/23/23, PageID#: 3528-29.) The assignments to diver, standby diver, and tender would sometimes rotate based on straight rotation, and other times, VRH wanted to utilize its most productive divers. (R. 90, Tr. 2/22/23, PageID#: 3269; R. 91, Tr. 2/23/23, PageID#: 3160-11.)

### 3. Schlosser's Employment.

Schlosser was employed by VRH commencing May 23, 2016, and concluding on July 28, 2016, when she resigned without notice based on allegations raised for the first time. (R. 89, Tr. 2/21/23, PageID#: 3135, 3208.) Schlosser was hired to

work on the Cape Project in various roles, as a "Diver, Standby Diver, Tender and UXO Technician I." (R. 89, Tr. 2/2/1/23, PageID#: 3141.)

Schlosser testified that, on the first day of the project, Alogna asked her to do a "knot test for him" by asking her to "tie a knot" and "had [her] practicing knots during work hours," which she claims made her "uncomfortable" and "singled out." (R. 89, Tr. 2/21/23, PageID#: 3144-45.) Alogna testified that on that date during dive station setup, he witnessed Schlosser with a piece of line in her hand practicing tying knots, so he went over to her and asked her if she knew how to tie a Bowline knot, which she said she did not. (R. 91, Tr. 2/23/21, PageID#: 3541.) He explained to her the knot and that she ought to practice it because it is used extensively in diving. (*Id.*) The bowline knot is part of the curriculum for the American National Standards Institute, which dictates course content and curriculum for commercial divers. (*Id.* PageID#: 3541-42.) He did not ask any other divers about tying a diver knot because he had not seen them with a piece of line practicing but has had such conversations with other employees in the past. (*Id.* PageID#: 3542.) After that brief conversation, he later witnessed her sitting in the work truck practicing the knot instead of helping her teammates to break down the site, and he told her, "Now is not the time to do that. Help your teammates unload the boat." (*Id.* PageID#: 3543.)

At the end of the first week, on June 1, 2016, Schlosser was verbally counseled to improve her work ethic by Alogna, Madden, and Adler after they witnessed/observed her substandard performance and lack of willingness to assist the team. (Pl.'s Ex. 14; R. 90, Tr. 2/22/23, PageID#: 3470-74.) The informal counseling was initiated to address Schlosser's: (1) lack of willingness to assist team in daily performance of duties for sitting in truck tying knots on steering wheel while she should assist the team in unloading equipment from the small boat; (2) inattention during diving supervisor's briefing and walking off during COO's training on metal detectors; (3) disregard for diving conditions and proceedings in not following the Diver's progress and methodology as standby diver and tender; and (4) insufficient work habit in setting up and taking down diving station and accomplishing very little while other team members performed a majority of the work. (*Id.*) Alogna testified the counseling was not disciplinary, it was for behavior correction. (R. 91, Tr. 2/23/22, PageID#: 3545.)

Additionally, on June 1, 2016, Adler and Alogna decided that Schlosser should be temporarily placed in the tender's role instead of diving so that she could observe and learn from her more experienced teammates. (R. 91, Tr. 2/23/23, PageID#: 3545-46.) She was told this, and that she would not be diving again until production picked up. (R. 89, Tr. 2/21/23, PageID#: 3156.) A week later, however,

8

Adler gave her a positive regarding a noted improvement in her attitude and performance, and she was allowed to dive again. (R. 91, Tr. 2/23/23, PageID#: 3664.)

At another point, Schlosser was restricted from driving the company vehicle in protected areas on the job site because she repeatedly got the work vehicle stuck by driving off the delineated path and into the Munitions Response Site ("MRS"), which is a dangerous area that had not been cleared of UXO. (R. 91, Tr. 2/23/23, PageID#: 3634.) Adler witnessed Schlosser's immediate disregard of the driving directions he gave that resulted in her driving onto the prohibited areas of the MRS. (*Id.*; R. 90, 3253-55.)

Alogna testified he was a passenger when another similar incident of Schlosser's disregard of vehicle instructions occurred and resulted in the dive team truck being stuck and unavailable. (R. 91, Tr. 2/23/23, PageID#: 3552-53; R. 90, Tr. 2/22/23, PageID#: 3482-83.) Alogna was a passenger in the truck and gave the directions regarding the path to Schlosser. (*Id.*) There is no evidence that Alogna or Adler witnessed any male employee driving the dive team truck in complete disregard of specific instructions related to safe operation on the MRS. (*Id.*)

9

### 4.  VRH's Employment Policies.

VRH promulgated and disseminated an effective anti-harassment policy to Schlosser and the other employees on the project. (*See* VRH Appx., Pl.'s Trial Ex. 36, Appx_000017-18; R. 90, Tr. 2/22/23, PageID#: 3361, 3400-03; R. 89, Tr. 2/21/23, PageID#: 3223.) The policy informed employees that "VRHabilis, LLC provides a work environment that is pleasant, professional, and free from intimidation, hostility, or other offenses that might interfere with work performance. Harassment of any sort (verbal, physical, and/or visual) for any reason will not be tolerated, either by coworkers or by anyone conducting business with VRH. . . ." (VRH Appx., Pl.'s Trial Ex. 36, Appx_000017.) The anti-harassment policy further provides that "[h]arassment is considered a serious act of misconduct, and may subject an employee to disciplinary action up to and including termination. " (*Id.*)

The policy mandates that "[e]mployees have the responsibility to avoid any action or conduct that could be viewed as harassment, and to bring to management's attention any form of harassing behavior." (*Id.*) Additionally, the policy provides a mechanism for bypassing a harassing supervisor when making a complaint and permits any type of complaint or report to be made:

> While VRH encourages employees to communicate directly with the alleged harasser to make it clear that the harasser's behavior is unacceptable, offensive, or inappropriate, employees are not required to do so. For VRH to address any harassment, VRH must be made

aware of the alleged harassment. Report any incidents of harassment to your immediate supervisor, anyone within the HR Department, or any other management representative with whom the employee feels comfortable.

(*Id.,* Appx_000018.) It also provides that "VRH prohibits any employee from retaliating in any way against anyone who has raised a concern about sexual or any other type of harassment or discrimination against another individual." (*Id.*)

Furthermore, the record reflects that VRHabilis provided the policy to its project employees, including Schlosser. (R. 90, Tr. 2/22/23, PageID#: 3361, 3400-03; R. 89, Tr. 2/21/23, PageID#: 3223.) On May 16, 2016, Schlosser specifically sent an email to Diane Backes, the Human Resources Manager, stating: "In response to the VRH Employee Handbook, I, Ariel Schlosser, have read and understand your policies." (*Id.;* VRH Appx., Pl.'s Trial Ex. 36, Appx_000026.)

Finally, COO Adler gave project employees site-specific training on the Company's policies at the beginning of the Cape Poge Project, including the fact that VRH is an all-inclusive, diverse work environment and will not accept deviation from that policy. (R. 91, Tr. 2/23/23, PageID#: 3648.)

### 5. Tyler Sanders.

Schlosser alleges that she suffered verbal abuse her diving supervisor Tyler Sanders ("Sanders") that created a hostile work environment. Specifically, she testified Sanders would constantly berate her, "curse [her] out at work and was very

11

hostile." (R. 89, Tr. 2/21/23, PageID#: 3158.) But Schlosser never provided any specifics of this conduct, other than that after she talked to her teammates about a verbal counseling she received from Adler, and Sanders told her "that my best plan of action, . . . was that . . . I just stop talking, because he said I'm not a real diver, I've never worked a real job, my opinion doesn't matter, I need to keep my head down, shut the F up." (R. 89, Tr. 2/21/23, PageID#: 3152-53, 3155, 121:6-122:5, Schlosser.) Schlosser even admitted that there were "instances of friction" between her and Sanders in the context of "pretty heated discussions with Sanders about dive capabilities and what diving was." (R. 89, Tr. 2/21/23, PageID#: 3240-41.)

Regardless of the degree of hostility of Sanders' criticisms of her diving, VRH took prompt effect action when notified of Schlosser's complaint. On June 17, 2016, at 5:21 a.m., Schlosser sent an email to Human Resources Manager Diane Backes ("Backes"), in material part, stating:

> I am writing to you an official report of what I feel to be recurrent harassment by my superior.
>
> I recently reported this to the highest ranking person on the ground out here, yet nothing has been acknowledged on my behalf and no actions are being taken to resolve the issue other than an apparent threat on my job.
>
> I felt it necessary for my assurance that I send this directly to you to be documented.
>
> No action is necessarily needed, other than a stop to my daily verbal

abuse. Once that ends, I have full confidence that my superior, Tyler Sanders and I, will be able to work together peacefully, respectfully, productively and without fault from here on out.

(VRH Appx., Def.'s Trial Ex. 9, Appx_000028; R. 89, PageID#: 3160.)

After receiving that complaint of harassment, Backes responded to Schlosser the same day at 8:40 a.m. requesting additional information: "As I start the investigative process I will need your assistance to address your concerns. I will need details of exactly what was said or done, when, and where and who else was there. I can be available to talk to you, let me know and we can set up a time. . . ." (R. 90, Tr. 2/22/23, PageID#: 3405-06; VRH Appx., Def.'s Trial Ex. 9, Appx_000027.)

Additionally, Adler testified that after being advising of the complaint by Backes, he, as the company's COO, undertook his own investigation and took measures to ensure no further inappropriate conduct from Sanders towards Schlosser would occur. (R. 91, Tr. 2/23/23, PageID#: 3588-89, 3613-14, 3623-24; 3669-73; 3680-81.) Indeed, the jury heard that Adler immediately shut down diving operations on the job site on the morning June 17, 2016, and directed that Schlosser and Sanders be separated by switching her diving team supervisor to John Bigos, and a male diver was sent to Sanders' team. (R. 91, Tr. 2/23/23, PageID#: 3613-14; R. 90, Tr. 2/22/23, PageID#: 3259-60, 3409-10.)

13

Simultaneously, Adler promptly travelled to the project site that weekend, interviewed witnesses, and reported the results to Schlosser. (R. 91, Tr. 2/23/23, PageID#: 3669-73; R. 89, Tr. 2/21/23, PageID#: 3158-59.) Additionally, the Company's remedial actions included switching Sanders' lodging out of the communal house that Schlosser, other divers, and Sanders were living in to protect her from any further inappropriate conduct. (R. 91, Tr. 2/23/23, PageID#: 3591.) There was no proof at trial of any further "harassment" by Sanders subsequent to these remedial steps by Adler and Backes. (R. 90, Tr. 2/22/23, PageID#: 3266-68, 3319-20, 3409-10, 3421.)

Moreover, Schlosser never responded to Backes' initial email requesting additional details and information. Backes continued to investigate, and she emailed Schlosser again on June 20, 2016: "I'm following up on my email I sent you on Friday. You didn't respond to set up a time to talk or send me any information on what happened. I do need information from you, so please let me know if email or a phone call works best for you." (R. 90, Tr. 2/22/23, PageID#: 3407-08; VRH Appx., Def.'s Trial Ex. 9, Appx_000027.) Finally, on June 21, 2016, Backes followed up with Schlosser a third time by text message stating, "Hi Ariel, I have sent you a few emails and I haven't heard back from you. Please confirm you received them. . . ." (R. 90, Tr. 2/22/23, PageID#: 3407-08; VRH Appx., Def.'s Trial Ex. 9,

14

Appx_000029.) Schlosser replied on that date: "Apologies, I have received them, I haven't had enough time alone to sort my thoughts and write them down. Also I get no service on this island!! I will reply to your email by the need of the day, thanks Diane." (*Id.*)

The testimony at trial from Backes was that Schlosser never followed up with Backes, nor did she provide the information on details or witnesses to what was said that Backes requested. (R. 90, Tr. 2/22/23, PageID#: 3406-11.) Indeed, the next time Backes heard from Schlosser was on June 24, 2016, when Schlosser sent the following email:

> All issues have been solved swiftly and with great haste. VRHabilis has gone above and beyond to address and alleviate all concerns on my behalf. I am grateful to everyone involved in quickly and efficiently addressing the situation. I am relieved and more than satisfied with the end result. Thank you.

(R. 90, Tr. 2/22/23, PageID#: 3409; VRH Appx., Def.'s Trial Ex. 9, Appx_000030.)

### 6. Aaron Brouse.

Schlosser further testified at trial about three incidents with Aaron Brouse ("Brouse") she alleged were evidence of a hostile work environment. The first two occurred on the same day, July 19, 2016, and involved an incident with a diver's helmet and a tender's personal flotation device. (R. 89, Tr. 2/21/23, PageID#: 3172-

74, 3176). The third incident occurred a week to ten days later, where she testified that Brouse accused her of staring at him. (*Id.,* PageID#: 3178, 3181.)

The first incident involved Schlosser cleaning Brouse's diver's helmet. Schlosser testified that Brouse "*trie[d]* to push her aside;" she responded "Hey, I'm fixing this speaker;" and he told her, "'I don't give a --.' A lot of expletives. . . 'I don't give a sh— what you're doing. I'm not going to sit around while you fiddle with it for five minutes.'" (*Id.,* PageID#: 3172-73.)

With respect to the second incident involving the personal flotation device and tender duties, Schlosser testified that Brouse screamed and cursed at her, called "her a slimy b****;" said "There's a reason nobody f---ing likes you;"; and said "they'll fire you before they fire me. You want an enemy, I'll give you one. I'll make your life a living hell." (*Id.*, PageID#: 3173-74, 3176.) She testified that in this incident, she threw the personal flotation device in the back of the work truck, to which Brouse immediately reacted,  got upset and accused her of throwing it at him. (*Id.,* PageID#: 3174-75.)

Brouse then went to the Site Manager Paul Baril ("Baril") and complained about Schlosser. Baril asked Schlosser and Brouse for statements describing the dispute, but only Brouse submitted one. (R. 90, Tr. 2/22/23, PageID#: 3321-3322.) Schlosser admitted that Baril attempted to stop dive operations to switch Schlosser

16

and Brouse around, but she "pleaded for him not to" because she did not want her name mentioned in another spat. (*Id.* PageID#: 3326.) Indeed, Baril reported the incident between Brouse and Schlosser to the Project Manager Madden and Backes on July 19, 2016, and stated, in material part:

> Ariel stated that she would not submit a statement. *She felt that this was an off hours issue and did not relate to work.* Additionally, she stated that she was already under scrutiny and did not wish to pursue this matter with anyone outside the team. . . . I have informed and reminded both of these employees that they were engaged with MEC [munitions and explosives of concern] and UXO removal operations involving life and that this cannot be tolerated.

(VRH Appx., Def.'s Trial Ex. 29, Appx_000034 (emphasis added); R. 90, Tr. 2/22/23, PageID#: 3411-3413 168:9-170:18, 175:15-22, Backes.)  With that email, he forwarded the written statement Brouse submitted, which stated the following:

> There have been many arguments between myself and Ariel. Some issues are related to off work and keeping the common areas clean. Others have been work related and contributing to production.

> On the morning of July 19[,] I was assigned as standby diver. Dive station was set up and it was time for me to clip in, and hat up to do my final checks. At this point Ariel walks up with a paper towell [*sic*] and insists the hat needs to be dusted off and cleaned. As we were all standing there writing I told her 3 times to let it be and let me hat up. After the third request I told her to move and I grabbed my hat and suited up.

> Once the primary diver entered the water I told her I had enough of her poor hygiene at the house and her poor work ethic at the site. So I will make sure she remembers to clean her messes up in the common areas

17

and not leaving soaking dirty clothes in the middle of the floor for the weekend.

At this point I walked to the truck and got the life jacket the tender is supposed to wear and set it on the tenders and told her she needs to wear it for safety. At this point she told me to shut up.

I sat down on the tail gate to observe the diver at that point she threw the life jacket at me which missed and flew into the bed of the truck. At this time I notified Paul and decided to cease speaking to her on this issue.

(VRH Appx., Def.'s Trial Ex. 29, Appx_000035-36; R. 90, Tr. 2/22/23, PageID#: 3418.)

Finally, the third incident attributed to Brouse happened a week to ten days later between July 19, 2016, and the date of her written resignation on July 28, 2016, where Brouse accused her of staring at him, and said, "Stop staring at me," and "Do you know why it is nobody f'ing likes you?" (R. 89, Tr. 2/21/23, PageID#: 3177-78, 3181.) Ms. Schlosser never made any complaint about Brouse to Backes in connection with any of these three incidents prior to her resignation. (R. 90, Tr. 2/22/23, PageID#: 3323.)

### 7. Schlosser's Resignation.

On July 28, 2016, Schlosser sent Backes a lengthy/detailed email resigning from her position with VRH. (VRH Appx., Def.'s Ex. 27, Appx_000031-33; R. 90, Tr. 2/22/23, PageID#: 3420.) First, Schlosser mentioned the issues with Sanders she

18

previously raised in minimal detail to Backes. (*Id.*, PageID#: 3421.) Next, Schlosser raised complaints for the first time related to Brouse's behavior. (*Id.,* PageID#: 3241-42.) Schlosser also raised several issues about not being allowed to dive and alleged discrimination due to her gender. (*Id.* PageID#: 3422-25.)

VRH's witnesses and plaintiff testified that Schlosser had not reported or informed VRH's COO Adler or HR Manager Backes of alleged harassment or hostile work environment by Brouse. (R. 90, Tr. 2/22/23, PageID#: 3421; R. 91, Tr. 2/23/23, PageID#: 3624-25.)

### SUMMARY OF THE ARGUMENT

Schlosser's hostile work environment claim cannot stand as a matter of law. First, the District Court erred considering the knot test, verbal counseling, diving rotations, and restricted vehicle driving privileges as evidence of harassment or of a hostile work environment, when the jury in this case expressly concluded as fact that the same conduct did not constitute discrimination because of Schlosser's sex or gender. It would be both impossible and inconsistent to hold that such conduct was based on her gender and sex for harassment purposes.

Second, the originally reported conduct by Sanders cannot be proof establishing a hostile work environment claim as a matter of law. The proof at trial showed that any such yelling and cursing was based on Sanders' issues with her

diving abilities. There is no evidence anywhere in the record that such conduct was based on Schlosser's sex or gender. Moreover, there was no evidence that Sanders' conduct was "severe" or "pervasive."

And even if Schlosser proved that such conduct was sufficiently severe or pervasive, which she cannot, it is unrebutted that she failed take advantage of the VRH anti-harassment policies and procedures, including corrective opportunities provided by VRH to avoid harm. She knew of and availed herself of the protections of the policy and subsequent investigation by VRH triggered by her complaint of verbal harassment by Sander on June 17, 2016. But she refused to provide information in the investigation initiated by Human Resources Manager Backes' requests. Nevertheless, VRH still acted promptly on the information initially provided, and took prompt effective remedial action, which resulted in Schlosser stating, "All issues have been solved swiftly and with great haste. VRHabilis has gone above and beyond to address and alleviate all concerns on my behalf." Accordingly, her claims are barred by the *Farragher/Ellerth* affirmative defense.

Finally, the verbal conduct attributed by Schlosser to Brouse cannot establish a hostile work environment as a matter of law because it was not severe or pervasive, and Schlosser failed to avail herself of the corrective opportunities offered by VRH to protect her from the alleged harassment. The evidence at trial showed there were

20

only three incidents where Brouse cursed at her, two of which occurred on the same day, and a third where Brouse accused her of staring at him. Such conduct cannot be considered either severe or pervasive sufficient to establish a claim for a hostile work environment. The evidence showed that even when one of the VRH site supervisors, Baril, received Brouse's report of an altercation between the two, Schlosser first refused to cooperate with his initial investigation and provide a written statement, and then she declined his efforts to be separate her and Brouse and remove her from the potential for future disputes. Moreover, Schlosser never complained about any conduct related to Brouse's anger until she wrote her resignation email.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment as a matter of law de novo, applying the same standard as the district court. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). "That is, judgment as a matter of law may be granted only if in viewing the evidence in the light most favorable to the non- moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Noble v. Brinker Int'l, Inc.,* 391 F.3d 715, 720 (6th Cir. 2004). "When reviewing the facts of a discrimination claim after there has been a full trial on the merits," this Court "focus[es] on the ultimate question of discrimination rather than on whether a

plaintiff made out a prima facie case." *Barnes*, 401 F.3d at 736. Nonetheless, the Court will consider the "evidentiary underpinnings of a Plaintiff 's prima facie case" in determining whether the "plaintiff has proven its case by a preponderance of the evidence." *Id*. (brackets omitted).

## ARGUMENT

### A. VRH Is Entitled To Judgment As A Matter Of Law On Schlosser's Hostile Work Environment Claims.

The District Court erred in denying judgment as a matter of law on Schlosser's claims of hostile work environment harassment based on her sex. To prevail on a hostile work environment claim under Title VII, "an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable." *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 733 (6th Cir. 2006) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).

The standard for employer liability differs depending on whether the harassment was carried out by a supervisor or coworker. In the case of a harassing supervisor, the employer is vicariously liable for the hostile work environment. *Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 348 (6th Cir. 2005). But when committed by a coworker, the employer is liable only "if it knew or should have

known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* (quoting *Hafford,* 183 F.3d at 513). "[T]his court has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips v. UAW Int'l,* 854 F.3d 323, 328 (6th Cir. 2017).

Here, Schlosser failed to present evidence sufficient to support a jury finding that *any* harassing acts were based on her gender, much less that she suffered "severe or "pervasive" harassment *based on that protected characteristic*. As a matter of law, Schlosser's evidence falls far short of what is required to make out a hostile work environment claim.

### B.    The District Court Erred in Considering Other Actions as Harassing Conduct Under the Totality of the Circumstances.

The District Court erred in considering: (a) the "knot test;" (b) verbal counseling; (c) diving rotations; and (d) driving privileges as part of the totality of the circumstances that could constitute illegal harassment. (*See* R. 96, Mem. Op., PageID#: 3874.)

Specifically, Schlosser alleged and relied upon that same conduct in support of her gender discrimination claim. (*See* R. 1, Compl., PageID#: 4-8, 10-12.) Nevertheless, the jury expressly held that Schlosser failed to prove by a preponderance of the evidence that "Defendant discriminated against her because of

23

her sex or gender." (R. 72, Verdict Form, PageID#: 2880.) Accordingly, it would be inconsistent and illogical to find that such actions constituted hostile work environment harassment based on her sex. The evidence for each of those actions shows they were based on legitimate, non-discriminatory reasons as explained above, and the jury found in favor of VRH on such issues. The only remaining difference in the proof is the alleged conduct by Sanders and Brouse, which, as discussed below, is legally insufficient to establish a hostile work environment claim as a matter of law.

### C.    No Evidence Supports Schlosser's Claim of Hostile Work Environment by Tyler Sanders.

#### 1. Schlosser Presented No Evidence of Harassment By Sanders Based On Sex.

First, Schlosser failed to establish that any verbal conduct or alleged harassment by Sanders was "based on" her sex. "To establish that the harassment she experienced was based on her gender, [Schlosser] must show that she would not have been the object of harassment but for her gender." *Graves v. Dayton Gastroenterology, Inc.,* 657 F. App'x 485, 488 (6th Cir. 2016). There is no proof in the record that any of the "daily verbal abuse" from Sanders was based on, or in any way arose from or related to, Schlosser's gender. Schlosser presented no proof that

Sanders ever made any gender-specific epithets, or that he ever physically grabbed, rubbed or contacted her.

As the Sixth Circuit noted in *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 464 (6th Cir. 2000), "while [the plaintiff] may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender." *See also Barnette v. Dep't of Veterans Affairs,* 153 F.3d 338, 343 (6th Cir. 1998) ("personal conflict does not equate with discriminatory animus"). Here, Schlosser offered no trial evidence whatsoever to demonstrate that Sanders acted as he did because Schlosser is a woman, or that any hostility in the workplace was in some way related to her sex. The last paragraph of Schlosser's June 17, 2016 email refers specifically to the similar personal conflict circumstance addressed in *Anderson* as not equating to discriminatory animus:

> Once that [my daily verbal abuse] ends, I have full confidence that my superior, Tyler Sanders and I, will be able to work together peacefully, respectfully, productively and without fault from here on out.

(VRH Appx., Def.'s Trial Ex. 9, Appx_000028.) Schlosser's description belies the conclusion that the conduct was based on her sex, and  it shows that she and Sanders had developed a personal conflict that was expressed by Sanders through his verbal outburst. (R. 89, Tr. 2/21/23, PageID#: 3239-40; R. 90, Tr. 2/22/23, PageID#: 3258-59,  3267-68.) Indeed, her own testimony makes clear that Sanders' issues were with

Schlosser's diving abilities. (R. 89, Tr. 2/21/23, PageID#: 3152-53, 3155, 3240-41, R. 90, Tr. 2/22/23, PageID#: 3267-68.)

The District Court cited *Williams v. GMC,* 187 F.3d 553 (6th Cir. 1999) in finding that Schlosser had demonstrated harassment based on sex. (*See* R. 96, Mem. Op., PageID#: 3874.) In *Williams,* a female employee at General Motors' Delphi–Packard plant, alleged 15 instances of sexually harassing behavior. 187 F.3d at 559. She contended that she overheard a co-worker, Don Giovannoe, say "hey slut" as she approached; her supervisor, Pat Ryan, looked at her breasts and said "you can rub up against me anytime" and "you would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face"; Ryan came up behind her and said "Back up; just back up" or "You can back right up to me"; Ryan put his arm around her neck, leaned his face into hers, and said, while she was seated at her desk writing "Hancock Furniture Company" on a piece of paper, that "You left the dick out of the hand"; and that she came in for her shift to find a box of forms glued to her desk; heard Giovannoe say "I'm sick and tired of these fucking women"; had boxes thrown at her by Giovannoe; was denied overtime, a key to the office, breaks and permission to sit at the table at the window of the tool crib where she worked; and was padlocked in the crib by a female co-worker. *Williams,* 187 F.3d at 558–59.

26

The *Williams* Court reasoned that non-sexual pranks, including finding office supplies glued to one's desk, being hit by a thrown box, and being locked in one's work area still constitute acts of harassment "based on sex" because they are part and parcel of a demonstrated pattern of sexual hostility. *Id.* at 563–64.

Here, however, the logic should not work in reverse. Where the *Williams* court identified a demonstrated pattern of sexual hostility and projected it onto a few instances of facially non-sexist conduct, Schlosser attempts to graft one piece of evidence based on sex-hostility—Brouse's usage of the term "Bi***"—onto a pattern of facially non-sexist conduct. Indeed, in *Bowman,* 220 F.3d 456, 464, this Court came to the opposite conclusion and reasoning of *Williams*. In comparing the factual situations in those two cases, the *Bowman* Court stated:

> In Title VII actions, however, it is important to distinguish between harassment and discriminatory harassment in order to "ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citation omitted). In *Williams,* evidence that the plaintiff was ostracized on myriad instances when others were not, combined with gender-specific epithets used, such as "slut" and "fucking women," was sufficient to create an inference that her gender was the motivating impulse for her co-workers' behavior and allowed the non-sexual harassment to be considered in the hostile environment analysis. *See Williams,* 187 F.3d at 565-66. Unlike the plaintiff in *Williams,* Bowman has not alleged that [the defendant] made a single comment evincing an anti-male bias. Besides a bare and unsupported assertion that some women employees were allowed to engage in work outside the University while he was not, Bowman has not shown that the non-sexual conduct he complains of had anything to do with his gender.

27

> While he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender.

*Bowman,* 220 F.3d at 464.

Like the plaintiff in *Bowman* on summary judgment, Schlosser here failed to offer any proof at trial that the mistreatment she complains of was "based on her sex." (R. 89, Tr. 2/21/23, PageID#: 3155, 3158, 3240-41; R. 90, PageID#: 3266-68.) Even her initial complaint to Backes did not mention anything about Sanders' abusive verbal conduct relating to or motivated by her sex. (*See* VRH Appx., Def.'s Trial Ex. 9, Appx_000028; R. 90, Tr. 2/22/23, PageID#: 3404-05.) Similarly, in her July 28, 2016 resignation email, she merely stated, "My supervisor, Tyler [Sanders], was unable to lead in a professional manner, proven by his outbursts of screaming obscenities and hateful speech at me while on the dive site." (VRH Appx., Def.'s Trial Ex. 27, Appx_000126.) Her contemporaneous description of his verbal outbursts in her resignation email omit any reference to her gender as motivation.

Moreover, at trial, Schlosser introduced no proof to indicate that any of the conduct by Sanders in yelling and cursing at her had anything to do with her gender. Indeed, the proof at trial was that Sanders' conduct primarily concerned her work performance on the dive site. (R. 89, Tr. 2/21/23, PageID#: 3158, 3240-41; R. 90, Tr. 2/22/23, PageID#: 3267-68; R. 91, Tr. 2/23/23, PageID#: 3580-81.) While

28

Sanders' verbal conduct was unprofessional, the proof showed his motivation was a clash of personalities between Sanders and Schlosser, not due to gender bias. *See Barnette v. Dep't of Veterans Affairs,* 153 F.3d 338, 343 (6th Cir. 1998) ("personal conflict does not equate with discriminatory animus"); *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 836 (6th Cir. 1996) (no actionable age discrimination where "hostility and abusiveness" in workplace "stemmed from a simple clash of personalities" and not age-related discrimination); *White v. Coventry Health & Life Ins. Co.,* 680 F. App'x 410, 415-16 (6th Cir. 2017) (finding under Rule 12(b)(6) the complaint's allegations "wholly conclusory" where plaintiff alleged "that 'almost from the very beginning of [her] employment she suffered from harassment, discrimination, intimidation, berating and a hostile work environment,' that she was 'constantly berated' by a supervisor, and that [supervisor] 'degraded and humiliated' her. Such naked assertions add nothing to the complaint's sufficiency.").

Mere disrespect or antipathy is not actionable unless it was motivated by a discriminatory animus. *See Oncale v. Sundowner Offshore Servs., Inc.* 523 U.S. 75, 80 (1998) (Title VII does "not prohibit all verbal or physical harassment in the work-place; it is directed only at 'discriminat[ion] . . . because of" protected characteristics) (emphasis omitted; alterations in original). As this Court has explained, the "conduct of jerks, bullies, and persecutors is simply not actionable

29

under Title VII unless they are acting because of the victim's [protected status]." *Wasek v. Arrow Energy Servs., Inc.,* 682 F.3d 463, 467 (6th Cir. 2012).

Finally, Schlosser's and the District Court's reliance on the fact that she was the only female diver employed on the job site is not sufficient to infer that Sanders' conduct complained of was based on her gender. *See Stokes v. Ohio Truck Sales, LLC,* No. 3:21-CV-00371-JGC, 2022 WL 4599254, at *7 (N.D. Ohio Sept. 30, 2022) (finding the fact that plaintiff was only woman in specific building did "not compel the conclusion that the instances she highlights occurred because she is a woman. Sixth Circuit case law does not support a presumption that any attitude or hostility a woman encounters in a male-dominated workplace is based on sex. While this circumstance is relevant, more is needed to support that conclusion.").

### 2. Schlosser Presented No Evidence of Severe or Pervasive Discriminatory Harassment by Sanders.

Even if Sanders' conduct was discriminatory as to sex—of which there is no proof—it plainly was not shown to be "severe or pervasive." "A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman*, 220 F.3d at 463 (citation omitted; alteration in original).

Sanders' conduct falls far short of the requisite standard based on Schlosser's evidence.

Additionally, harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citation omitted). This test has both an objective and a subjective component: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive. *Id.* at 21–22. In determining whether the conduct is severe or pervasive enough to constitute a hostile work environment, the Court must consider the totality of the circumstances an employee faces, including "the frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Title VII is not "a general civility code for the American workplace." *Oncale,* 523 U.S. at 80. Title VII does not provide a cause of action for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citations and internal quotation marks omitted). "[S]imple teasing

[and] offhand comments...will not amount to discriminatory changes in the terms or conditions of employment." *Id.*

Here, other than general allegations of cursing and yelling, there are simply no facts or proof that Sanders' conduct was sufficiently severe or pervasive to alter the terms and conditions of Schlosser's work performance. (R. 89, Tr. 2/21/23, PageID#: 3152-53, 3155, 3158, 3240-41; R. 90, Tr. 2/22/23, PageID#: 3267-69.) *See Goller v. Ohio Dep't of Rehab. & Corr.,* 285 Fed. Appx. 250 (6th Cir. 2008) (holding supervisor's derogatory name calling insufficient to establish hostile work environment and not sufficiently severe or threatening to interfere with plaintiff's work performance); *Trepka v. Bd. of Educ.,* 28 Fed. Appx. 455, 461 (6th Cir. 2002) (holding supervisor's "contentious oral confrontation" with yelling and "stern words about [plaintiff's] ability to walk" not hostile work environment).

### 3. VRH Cannot be Liable for a Hostile Work Environment by Sanders Under the Faragher/Ellerth Affirmative Defense.

If the harassment does not result in a tangible employment action, "the employer may escape liability by establishing" an affirmative defense under the *Faragher-Ellerth* framework. *Wyatt v. Nissan N. Am., Inc.,* 999 F.3d 400, 412 (6th Cir. 2021) (citing *Faragher,* 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998)).

32

### a. The harassment and verbal abuse alleged by Schlosser with respect to Sanders did not result in tangible employment action.

An employer is not entitled to the benefit of proving reasonable care to correct or prevent harassment under the *Faragher-Ellerth* defense where "the supervisor's harassment culminates in a tangible employment action." *Ellerth,* 524 U.S. at 765; *Faragher,* 524 U.S. at 808. VRH's proof at trial, verified by Schlosser's own admission, established that any harassment Schlosser described or allegedly attributed to Sander's verbal abuse, stopped as a result of VRH's remedial actions, including that Schlosser was assigned to work on the other diving supervisor's, John Bigos, dive team, and Sanders no longer resided in the same common residence as Schlosser. (R. 90, Tr. 23:10-25:8, 76:7-77:15 Schlosser; R. 90, Tr. 166:14-21, 178:16-18, 166:22-167:7, Backes.)

Under the *Faragher-Ellerth* framework, VRHabilis demonstrated that (1) it "exercised reasonable care to prevent and correct any harassing behavior" and (2) that Schlosser "unreasonably failed to take advantage of the preventive or corrective opportunities" that VRHabilis provided. *See Vance v. Ball State Univ.,* 570 U.S. 421, 424 (2013).

### b. VRH had a Reasonable and Effective Sexual Harassment Policy.

The first element involves evaluating whether VRHabilis had a "reasonable sexual harassment policy" and whether such policy "was effective in practice."

33

*Clark.,* 400 F.3d at 349–50; *see also Deters v. Rock–Tenn Co., Inc.,* 245 Fed. Appx. 516, *525 (6th Cir. 2007). Courts have not set an exact formula for assessing sexual harassment policies, but the Sixth Circuit has provided the following guidance: "'[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.'" *Deters,* 245 Fed. Appx. at 525 (quoting *Clark.,* 400 F.3d at 349).

As discussed above, VRH promulgated and disseminated a facially effective-anti-harassment policy. (*See* VRH Appx., Pl.'s Trial Ex. 36, Appx_000017-18; R. 90, Tr. 2/22/23, PageID#: 3361, 3400-03; R. 89, Tr. 2/21/23, PageID#: 3223.) The policy informed employees that harassment of any sort will not be tolerated, and that harassment is a serious act of misconduct which may subject an employee to disciplinary action up to and including termination. (*See* VRH Appx., Pl.'s Trial Ex. 36, Appx_000017.)

It further mandates that employees have the responsibility to bring any form of harassing behavior to management's attention, and it provides a mechanism for bypassing a harassing supervisor when making complaints, including to report to anyone with human resources responsibilities or any other member of management

34

with whom the employee feels comfortable. (*Id.*, Appx_000018.) It also provides

that "VRH prohibits any employee from retaliating in any way against anyone who

has raised a concern about sexual or any other type of harassment or discrimination

against another individual." (*Id.*) Further, VRHabilis provided the policy to

Schlosser, and Schlosser acknowledged that she "read and understand[s] your

policies." (R. 90, Tr. 2/22/23, PageID#: 3361, 3400-03; R. 89, Tr. 2/21/23, PageID#:

3223; VRH Appx., Pl.'s Trial Ex. 36, Appx_000026.) *See Collette v. Stein-Mart,*

*Inc.,* 126 F. App'x 678, 685 (6th Cir. 2005) ("[G]iving employees written notice of

[anti-harassment] policies and how they are enforced constitutes an adequate general

preventive measure.").

Accordingly, VRHabilis had an effective policy to prevent, stop, and address

harassment. It is also material to the effectiveness of VRH's policy that Schlosser

made a complaint pursuant to the policy, which by her own words, resulted in "[a]ll

issues [being] solved swiftly and with great haste." (VRH Appx., Def.'s Trial Ex. 9,

Appx_000030; R. 90, Tr. 2/22/23, PageID#:  3266-68.)

### c. *Schlosser Unreasonably Failed to Take Advantage of The Corrective Opportunities Provided by VRH to Avoid Harm.*

With respect to the second prong of the *Faragher/Ellerth* defense, Schlosser

unreasonably failed to take advantage of the corrective opportunities provided by

VRHabilis to avoid harm. After her initial June 17, 2016, 5:21 a.m. email to Backes,

Backes emailed Schlosser the same day at 8:40 a.m. requesting additional information: "As I start the investigative process I will need your assistance to address your concerns. I will need details of exactly what was said or done, when, and where and who else was there. I can be available to talk to you, let me know and we can set up a time. . . ." (R. 90, Tr. 2/22/23, PageID#: 3405-06; VRH Appx., Def.'s Trial Ex. 9, Appx_000027.)

After not hearing anything from her, Backes emailed her again on June 20, 2016: "I'm following up on my email I sent you on Friday. You didn't respond to set up a time to talk or send me any information on what happened. I do need information from you, so please let me know if email or a phone call works best for you." (R. 90, Tr. 2/22/23, PageID#: 3407-08; VRH Appx., Def.'s Trial Ex. 9, Appx_000027.) Finally, on June 21, 2016, Backes followed up with Schlosser by text message stating, "Hi Ariel, I have sent you a few emails and I haven't heard back from you. Please confirm you received them. . . ." (R. 90, Tr. 2/22/23, PageID#: 3407-08; VRH Appx., Def.'s Trial Ex. 9, Appx_000029.) Schlosser replied on that date: "Apologies, I have received them, I haven't had enough time alone to sort my thoughts and write them down. Also I get no service on this island!! I will reply to your email by the end of the day, thanks Diane." (*Id.*) The testimony at trial from Backes was that Schlosser never followed up with Backes, nor did she provide the

information on details or witnesses to what was said by Sanders that Backes requested. (R. 90, Tr. 2/22/23, PageID#: 3406-11.)

Indeed, the next time Backes heard from Schlosser was on June 24, 2016, when Schlosser sent the following email:

> All issues have been solved swiftly and with great haste. VRHabilis has gone above and beyond to address and alleviate all concerns on my behalf. I am grateful to everyone involved in quickly and efficiently addressing the situation. I am relieved and more than satisfied with the end result. Thank you.

(R. 90, Tr. 2/22/23, PageID#: 3409; VRH Appx., Def.'s Trial Ex. 9, Appx_000030.)

Schlosser's failure to respond to Backes' efforts to investigate the details in her emails is an unreasonable failure to take advantage of the preventative measures offered by VRHabilis. Indeed, Backes testified that Schlosser's failure affected Backes' ability to investigate. (R. 90, Tr. 2/22/23, PageID#: 3410-11.)

Nevertheless, despite Schlosser's failure to participate in the investigation being undertaken by Backes, Adler testified that he/the Company accepted Schlosser's email complaint and took measures to remove her from Sanders' dive team and protect her from opportunities for further inappropriate verbal conduct by Sanders. (R. 91, Tr. 2/23/23, PageID#: 3588-89, 3613-14, 3623-24; 3669-73; 3680-81.) Indeed, the testimony was that COO Adler immediately shut down project operations on the job site on the morning June 17, 2016, and directed that Schlosser

37

and Sanders be separated by switching her diving team supervisor to John Bigos. (R. 91, Tr. 2/23/23, PageID#: 3613-14; R. 90, Tr. 2/22/23, PageID#: 3259-60, 3409-10.) Adler promptly travelled to the project site that weekend, interviewed witnesses and reported the results to Schlosser. (R. 91, Tr. 2/23/23, PageID#: 3669-73; R. 89, Tr. 2/21/23, PageID#: 3158-59.) Additionally, VRH's remedial actions included moving Sanders out of the house that Schlosser and other divers were living in to insulate her from any further inappropriate verbal conduct. (R. 91, Tr. 2/23/23, PageID#: 3591.) There was no proof at trial that Schlosser suffered any further verbal "harassment" by Sanders. (R. 90, Tr. 2/22/23, PageID#: 3266-68, 3319-20, 3409-10, 3421.)

The Sixth Circuit has stated that "[t]he most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Collette,* 126 F. App'x at 686 (quoting *Swenson v. Potter,* 271 F.3d 1184, 1193 (9th Cir. 2001)). By doing so, "the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace." *Id.* That, and more, is what was done here. *See also Waldo v. Consumers Energy Co.,* 726 F.3d 802, 814 (6th Cir. 2013) ("Generally, a response is adequate if it is reasonably calculated to end the harassment.") (internal quotation omitted); *Harris v. Sodders,* No. 07-4398,

38

2009 WL 331633, at *2 (6th Cir. Feb. 11, 2009) (employer's actions appropriate in part because "[e]ven though [employer] was unaware of the alleged harassment, his decision to transfer [the harasser] had the inadvertent effect of stopping the harassment").

In *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 262 (5th Cir. 1999), the Fifth Circuit found that although the plaintiff promptly complained of her supervisor's harassing conduct, because the company promptly responded, disciplined the harasser appropriately, and stopped the harassment, the employer was relieved of Title VII vicarious liability. That court reasoned "if the plaintiff complains promptly, the then-incidental misbehavior can be stymied before it erupts into a hostile environment, and no actionable Title VII violation will have occurred." *Id.* Significantly, the court noted that imposing vicarious liability where an employer "nipped a hostile environment in the bud" would undermine Title VII's deterrent policy and that judgment as a matter of law was appropriate "precisely because the company forestalled the creation of a hostile environment." *Id.* at 266.

Accordingly, even assuming Schlosser had presented proof sufficient to establish a hostile work environment claim based on the conduct by Sanders, which she did not, her claim must fail as a matter of law based on the *Faragher/Ellerth* defense, which VRHabilis met.

**D.** **No Evidence Supports Schlosser's Claim of Hostile Work Environment by Aaron Brouse.**

Schlosser's claims regarding the conduct by Brouse similarly fail to establish actionable harassment because (1) Brouse's use of abusive language was not proved to be sufficiently severe or pervasive; and (2) there is no basis to impose employer liability because Schlosser failed to take advantage of the Company's anti-harassment policies and procedures providing preventative measures to stop any harassment.

### 1. Brouse's Conduct was not Severe or Pervasive.

The District Court erred when it relied on the "fact" that Brouse "physically pushed Schlosser." (*See* R. 96, Mem. Op., PageID#: 3874.)  The record, however, does not reflect that "fact."  Instead, Schlosser testified: "So I was just doing, you know, last checks, make sure everything's good on it and fixing that speaker, and Brouse *tries* to push me aside, and – and, you know, I tell him, "Hey I'm fixing this speaker. . . ." (R. 89, Tr. 2/21/23, PageID#: 3172.)

Courts distinguish between cognizable harassment and mere annoyance, as Title VII was not meant to become a "'general civility code.'" *Oncale,* 523 U.S. at 80.  The Sixth Circuit precedent establishes that isolated incidents are insufficient to show a hostile work environment. Evidence of Brouse's alleged vulgarities were not harassment. Indeed, the Sixth Circuit sets a high threshold for plaintiffs to make such

40

a showing. *See, e.g., Clark,* 400 F.3d at 352 (holding that where supervisor told vulgar jokes, twice placed his vibrating pager on plaintiff's thigh, and pulled at her overalls after she told him she was wearing a thong, the conduct did not establish a hostile work environment); *Gwen v. Reg'l Transit Auth.,* 7 Fed. Appx. 496, 502 (6th Cir. 2001) (unreported) (holding that where employee, over the course of one day, twice exposed his genitals to plaintiff and approached her while making "rude and inappropriate comments" and where the plaintiff later sought treatment from a psychologist, the offensive conduct did not unreasonably interfere with work performance so as to create a hostile working environment) (citing *Fleenor v. Hewitt Soap Co.,* 81 F.3d 48, 49 (6th Cir. 1996) (finding no hostile work environment where employee exposed his genitals to plaintiff on a number of occasions, threatened to force plaintiff to engage in oral sex with him, and "stuck a ruler up Plaintiff's buttocks" against plaintiff's will)); *Burnett v. Tyco Corp.,* 203 F.3d 980 (6th Cir. 2000) (finding no hostile environment where a supervisor had reached into an employee's blouse to put cigarettes in her bra and had told the employee she aroused him and had commented upon her lost virginity at a department meeting).

In *Burnett,* the Sixth Circuit explained that "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a

six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment." *Id.* at 985.

Here, even taking Schlosser's allegations as true, they were neither severe nor pervasive. At most they were isolated incidents of inappropriate behavior between two coworkers who were not getting along that occurred on two separate dates of July 19, 2016, and approximately one week to ten days later. (R. 89, Tr. 2/21/23, PageID#: 3177-78, 3181; R. 89, Tr. 2/21/23, PageID#: 3172-74, 3176; VRH Appx., Def.'s Trial Ex. 29, Appx_000034.)  Indeed, it is undisputed that Schlosser felt this was "an off hours issue" that did not relate to the work environment, and that she did not report the alleged conduct as harassment to Backes or another manager as she had previously with Sanders. (R. 89, Tr. 2/21/23, PageID#: 3165; R. 90, Tr. 2/22/23, PageID#: 3320-28, 3420; R. 91, Tr. 2/23/23, PageID#: 3624-25; VRH Appx., Def.'s Trial Ex. 29, Appx_000034.) These isolated incidents, although arguably inappropriate, do not satisfy the standard of severe or pervasive as a matter of law, and judgment should be entered against Schlosser and in favor of VRH on the claim of hostile work environment harassment.

### 2. Schlosser failed to offer sufficient evidence at trial that VRH "knew or should have known" of the alleged harassment by Brouse and did not take corrective action.

To find employer liability for hostile work environment, the employer's response to reported coworker's harassment must "manifest[ ] indifference or unreasonableness in light of the facts the employer knew or should have known." *Doe v. City of Detroit, Michigan,* 3 F.4th 294, 301 (6th Cir. 2021) (quoting *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 338 (6th Cir. 2008); *Blankenship v. Parke Care Ctrs., Inc.,* 123 F.3d 868, 873 (6th Cir. 1997)). An employer's response is generally adequate "if it is 'reasonably calculated to end the harassment.'" *Id.* (quoting *Jackson v. Quanex Corp.,* 191 F.3d 647, 663 (6th Cir. 1999)). "The appropriate corrective response will vary according to the severity and persistence of the alleged harassment." *West v. Tyson Foods, Inc.,* 374 F. App'x 624, 633 (6th Cir. 2010). "Steps that would 'establish a base level of reasonably appropriate corrective action' may include promptly initiating an investigation[,] ... 'speaking with the specific individuals identified'" in the complaint, "following up with the complainant," and "reporting the harassment to others in management." *Waldo v. Consumers Energy Co.,* 726 F.3d 802, 814 (6th Cir. 2013) (alteration omitted) (quoting *West,* 374 F. App'x at 633)).

As described above and proved at trial, the Company had a policy in place, including preventative measures to address and stop any harassment. Schlosser had previously used these procedures to report her issues with Sanders; and, following the Company's response, she stated: "VRHabilis has gone above and beyond to address and alleviate all concerns on my behalf. . . . I am relieved and more than satisfied with the end result." (VRH Appx., Def.'s Trial Ex. 9, Appx_000030; R. 90, Tr. 2/22/23, PageID#: 3256, 3409; R. 91, Tr. 2/23/23, PageID#: 3590-91.)

Despite her specific prior experience, it is undisputed that she (1) never reported the verbal altercations involving Brouse as harassment; (2) rejected the request to submit a written statement on the first incident when requested to do so; (3) "felt it was an off hours issue"; and (4) "did not wish to pursue this matter with anyone outside the team." (R. 90, Tr. 2/22/23, PageID#: 3256, 3321-23, 3409; R. 91, Tr. 2/23/23, PageID#: 3590-91; VRH Appx., Def.'s Trial Ex. 29, Appx_000034.) Schlosser's actions not only minimize the contemporaneous severity of Brouse's verbal conduct, but also prevented VRHabilis from undertaking enforcement of its policies to protect her from unwelcome harassment and are inconsistent with her claims at trial of "severe and pervasive harassment." (R. 90, Tr. 2/22/23, PageID#: 3422.)

Nevertheless, again the Company representative still addressed the situation when receiving notice from Brouse. Baril "informed and reminded both of these employees that we are engaged with MEC and UXO removal operations involving life and that *this cannot be tolerated.*" (R. 90, Tr. 2/22/23, PageID#: 3413; VRH Appx., Def.'s Trial Ex. 29, Appx_000034, emphasis added.) Schlosser admits as much in her resignation email: "Paul listened to Aaron, who was completely calm when Paul drove over, he then half heartedly listened to me and then attempted to stop dive operations in order to switch people around. I pleaded for him not to, because I did not want my name mentioned in another spat, especially one that halted production." (VRH Appx., Def.'s Trial Ex. 27, Appx_000031; R. 90, Tr. 84:1-85:5, Schlosser.)

Accordingly, the Company told both employees such conduct would not be tolerated and attempted to separate the two employees, but Schlosser pleaded for Baril not to do so. Each of these steps is in line with "reasonably appropriate corrective action" announced in *Waldo,* 726 F.3d at 814 ("promptly initiating an investigation[,] ... 'speaking with the specific individuals identified'" in the complaint, "following up with the complainant," and "reporting the harassment to others in management."). Therefore, Schlosser herself unreasonably failed to take

advantage of the procedures and corrective actions offered by the Company, and judgment should be entered as a matter of law in Defendant's favor.

## CONCLUSION

For each and all of the foregoing reasons, VRHabilis, LLC respectfully submits that this Honorable Court should reverse and render judgment in favor of VRHabilis, LLC.

Respectfully submitted this 30th day of January, 2024.

s/Bryce E. Fitzgerald
George R. Arrants, Jr., TN BPR #012555
Bryce E. Fitzgerald, TN BPR #033289
KRAMER RAYSON LLP
P. O. Box 629
Knoxville, TN 37901-0629
(865) 525-5134
garrants@kramer-rayson.com
bfitzgerald@kramer-rayson.com

***Attorneys for Appellant VRHabilis, LLC***

## CERTIFICATE OF COMPLIANCE

I hereby certify that the proof brief filed in this appeal complied with the type-volume limitation provided in Fed. R. App. P. 32(a)(7)(B) in that the proof brief contained 11,801 words of Times New Roman (14) point proportional type. The word processing software used to prepare this brief was Microsoft Word for Microsoft 365.

s/Bryce E. Fitzgerald
Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of January, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may gain access to this filing through the Court's electronic filing system.

s/Bryce E. Fitzgerald
 Bryce E. Fitzgerald

| APPELLEE'S DESIGNATION OF THE RELEVANT DISTRICT COURT DOCUMENTS | | |
|---|---|---|
| Description of Entry | Record Entry No. | PageID# Range |
| Complaint | R. 1 | 1-14 |
| Jury Trial – Begun Minute Entry | R. 55 | 1404 |
| Jury Trial – Completed Minute Entry | R. 70 | 2877 |
| Verdict Form | R. 72 | 2880-2883 |
| Judgment | R. 76 | 2931-2932 |
| Defendant's Renewed Motion for Judgment as a Matter of Law | R. 78 | 2951-2952 |
| Defendant's Memorandum in Support of Renewed Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b) | R. 79 | 2953-2970 |
| Plaintiff's Response in Opposition to Renewed Judgment as a Matter of Law | R. 83 | 3035-3036 |
| Plaintiff's Memorandum in Opposition to Defendant's Motion for Judgment as a Matter of Law | R. 84 | 3037-3050 |
| Defendant's Reply Brief in Response to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment as a Matter of Law | R. 86 | 3092-3104 |
| April 15, 2023 Order | R. 88 | 3118-3119 |
| Transcript (February 21, 2023) | R. 89 | 3120-3243 |
| Transcript (February 22, 2023) | R. 90 | 3244-3499 |
| Transcript (February 23, 2023) | R. 91 | 3500-3683 |
| Transcript (February 27, 2023) | R. 92 | 3684-3817 |
| Defendant's Supplemental Memorandum of Law in Support of Renewed Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(b) | R. 93 | 3818-3837 |

| Defendant's Revised Reply in Support of Defendant's Renewed Motion for Judgment as a Matter of Law | R. 94 | 3838-3850 |
|---|---|---|
| Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant's Motion for Judgment as a Matter of Law | R. 95 | 3851-3869 |
| October 18, 2023 Memorandum Opinion | R. 96 | 3870-3878 |
| Notice of Appeal | R. 97 | 3879-3880 |