No. 23-6019

---

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

## ARIEL SCHLOSSER
*Plaintiff/Appellee*

v.

## VRHABILIS, LLC
*Defendant/Appellant*

---

On appeal from the United States District Court
for the Eastern District of Tennessee, at Chattanooga
Case No. 3:20-cv-00190-TRM-JEM

---

## REPLY BRIEF OF
## DEFENDANT/APPELLANT VRHABILIS, LLC

---

George R. Arrants, Jr.
Bryce E. Fitzgerald
Kramer Rayson LLP
Post Office Box 629
Knoxville, TN 37901-0629
865-525-5134
garrants@kramer-rayson.com
bfitzgerald@kramer-rayson.com


Attorneys for Defendant/Appellant
VRHabilis, LLC

# TABLE OF CONTENTS

Table of Contents ................................................................. i

Table of Authorities ............................................................ ii

Introduction ..................................................................... 1

Argument ......................................................................... 1

I.   VRH Is Entitled To Judgment As A Matter Of Law On Schlosser's Hostile Work Environment Claim. ...................................................... 1

   A.   Schlosser Presented No Evidence Of Severe Or Pervasive Harassment. ............................................................... 1

B.   Schlosser Presented No Evidence Of Harassment Based On Her Sex. ............. 6

   1.   The "knot test" was not based on Schlosser's sex. .................... 6

   2.   Schlosser's driving privileges were not revoked based on her sex. ......... 7

   3.   Schlosser's removal from the dive rotation was not based on her sex. .......................................................... 8

   4.   There was no evidence that Sanders' conduct was based on Schlosser's sex. ................................................ 12

II.   VRH Cannot be Liable for a Hostile Work Environment by Sanders Under the Faragher/Ellerth Affirmative Defense. ............................. 14

A.   Sanders' Conduct Did Not Culminate in a Tangible Employment Action Against Her. ....................................................... 14

B.   Schlosser Unreasonably Failed To Take Advantage Of The Corrective Opportunities Provided By VRH To Avoid Harm. ........................... 17

C.   VRH Took Prompt, Effective Remedial Action That Eliminated Any Further Harassment By Sanders. ........................................ 18

   D.   Schlosser failed to offer sufficient evidence at trial that VRH "knew or should have known" of the alleged harassment by Brouse and did not take corrective action. ........................................ 24

Conclusion ....................................................................... 28

Certificate of Compliance ........................................................ 29

Certificate of Service ........................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998) ........................... 17, 18

*Cecil v. Louisville Water Co.,* 301 F. App'x 490, 496 (6th Cir. 2008) .....................2

*Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959-60 (8th Cir. 2004) .........16

*Ferraro v. Kellwood Co.,* 440 F.3d 96, 102 (2d Cir. 2006)....................................15

*Goller v. Ohio Dep't of Rehab. & Corr.,* 285 F. App'x. 250 (6th Cir. 2008)...........3

*Harris v. Sodders,* No. 07-4398, 2009 WL 331633, at *2 (6th Cir. Feb. 11, 2009)25

*Jones v. City of Franklin*, 309 F. App'x 938, 942–44 (6th Cir. 2009)......................3

*Lissau v. S. Food Serv., Inc.,* 159 F.3d 177, 182 (4th Cir. 1998) ...........................15

*Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001)

........................................................................................................................12

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002).....................2

*Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 840 (6th Cir. 2024) 2

*Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 783 (6th Cir. 2005) ...........................2

*Syed v. N. Kentucky Water Dist*., No. CIV.A. 08-197-DLB, 2010 WL 1235330, at

*7 (E.D. Ky. Mar. 23, 2010) ...............................................................................15

*Trepka v. Bd. of Educ.,* 28 F. App'x 455, 461 (6th Cir. 2002) .................................4

*Vance v. Ball State Univ.*, 570 U.S. 421, 424, (2013) .............................................15

*West v. Tyson Foods, Inc.,* 374 F. App'x 624 (6th Cir. 2010) .................................23

*Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 412 (6th Cir. 2021) ...........................15

## INTRODUCTION

Plaintiff/Appellee Ariel Schlosser's ("Schlosser") appellate response brief ignores pertinent evidence; her own testimony; controlling authority; and relies upon arguments that are either unsupported by the trial record, hyperbole, conjecture, or divorced from context. More importantly, she fails to refute Defendant/Appellant VRHabilis, LLC's ("VRH") showing that the record does not support her claims. Accordingly, the Court should reverse the District Court's judgment and enter judgment in favor of VRH as a matter of law.

## ARGUMENT

## I.     VRH Is Entitled To Judgment As A Matter Of Law On Schlosser's Hostile Work Environment Claim.

### A. Schlosser Presented No Evidence Of Severe Or Pervasive Harassment.

Schlosser's brief confirms that she presented insufficient evidence of severe or pervasive harassment. Specifically, like the District Court, Schlosser argues that the following separate discrete acts support her claim of severe and pervasive harassment: (a) the "knot test;" (b) verbal counseling; (c) her removal from diving rotations; and (d) revocation of her driving privileges. (*See* Schlosser Br. at 23-24.)

Nevertheless, the Supreme Court has explained that under Title VII, a plaintiff may bring a claim alleging that either (1) an employer engaged in "discrete discriminatory acts" such as "termination, failure to promote, denial of transfer, or

1

refusal to hire"; or (2) the employer's "repeated conduct" created a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002); *see also Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 840 (6th Cir. 2024). Because the two claims are "different in kind," this Court has "consistently held that allegations of discrete acts may be alleged as separate claims, and as such 'cannot properly be characterized as part of a continuing hostile work environment.'" *Ogbonna-McGruder*, 91 F.4th at 840 (quoting *Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 783 (6th Cir. 2005)).

Accordingly, the discrete acts relied upon by Schlosser do not constitute "harassment" and were separately alleged as part of her discrimination claims, which the jury found she failed to prove by a preponderance of the evidence. (*See* R. 1, Compl., PageID#: 4-8, 10-12; R. 72, Verdict Form, PageID#: 2880); *see also Cecil v. Louisville Water Co.,* 301 F. App'x 490, 496 (6th Cir. 2008) (claims that employer denied plaintiff training, gave her "unattainable and undesirable work assignments" and "outsource[ed] her job responsibilities" were discrete acts); *Jones v. City of Franklin*, 309 F. App'x 938, 942–44 (6th Cir. 2009) (finding that allegations of "lowered evaluation scores, disciplinary actions, and the lack of promotions" were "discrete acts of racial discrimination").

By contrast, only the alleged conduct by dive supervisor Tyler Sanders ("Sanders") and coworker Aaron Brouse ("Brouse") could even be properly considered in support of the hostile work environment claim, which were not sufficiently severe or pervasive to establish a hostile work environment claim as a matter of law. Indeed, Schlosser effectively concedes that their conduct was not sufficiently severe or pervasive by not addressing such claims specifically in her brief.

With respect to Sanders' conduct, other than general allegations of cursing and yelling, there are simply no facts or proof that his conduct was sufficiently severe or pervasive to alter the terms and conditions of Schlosser's work performance. (R. 89, Tr. 2/21/23, PageID#: 3152-53, 3155, 3158, 3240-41; R. 90, Tr. 2/22/23, PageID#: 3267-69.) *See Goller v. Ohio Dep't of Rehab. & Corr.,* 285 F. App'x 250, 259 (6th Cir. 2008) (holding supervisor's derogatory name calling insufficient to establish hostile work environment and not sufficiently severe or threatening to interfere with plaintiff's work performance); *Trepka v. Bd. of Educ.,* 28 F. App'x. 455, 461 (6th Cir. 2002) (holding supervisor's "contentious oral confrontation" with yelling and "stern words about [plaintiff's] ability to walk" not hostile work environment).

3

With respect to Brouse's conduct, Schlosser testified about three isolated incidents of his inappropriate behavior. That occurred on two separate dates starting July 19, 2016, and approximately one week to ten days later. (R. 89, Tr. 2/21/23, PageID#: 3177-78, 3181; R. 89, Tr. 2/21/23, PageID#: 3172-74, 3176; VRH Appx., Def.'s Trial Ex. 29, Appx_000034.) These were confrontations between two coworkers who were not getting along.

For the first incident, Schlosser testified that Brouse "*trie[d]* to push her aside;" she responded, "Hey, I'm fixing this speaker;" and he told her, "'I don't give a --.' A lot of expletives … 'I don't give a sh— what you're doing. I'm not going to sit around while you fiddle with it for five minutes.'" (*Id.,* PageID#: 3172-73.) For the second incident, which occurred the same day as the first, Schlosser testified that Brouse screamed and cursed at her, called "her a slimy b****;" said, "There's a reason nobody f---ing likes you;" and said, "they'll fire you before they fire me. You want an enemy, I'll give you one. I'll make your life a living hell." (*Id.*, PageID#: 3173-74, 3176.)

Finally, the third incident she attributed to Brouse occurred a week to ten days later, between July 19, 2016 and the date of her written resignation on July 28, 2016. Schlosser claimed Brouse accused her of staring at him, and said, "Stop staring at me," and "Do you know why it is nobody f'ing likes you?" and called her a "b****."

4

(R. 89, Tr. 2/21/23, PageID#: 3177-78, 3181.) It is undisputed that Schlosser: (a) never made any complaints to VRH about Brouse (R. 90, Tr. 2/22/23, PageID#: 3323); (b) refused to provide a written statement about the first two incidents when requested to do so, (R. 90, Tr. 2/22/23, PageID#: 3256, 3321-23, 3409; R. 91, Tr. 2/23/23, PageID#: 3590-91; VRH Appx., Def.'s Trial Ex. 29, Appx_000034); and (c) rebuffed an offer by the supervisor to separate the two of them by switching people on teams. (VRH Appx., Def.'s Trial Ex. 27, Appx_000031; R. 90, Tr. 84:1-85:5, Schlosser.) If Brouse's verbal confrontations were severe or pervasive, she likely would have taken at least one of those steps.

Moreover, Schlosser's brief incorrectly asserts that Brouse "physically assaulted" and "physically pushed her." (Schlosser Br. at 14, 24, 30, 35.) The record does not support this characterization of physical contact. Instead, Schlosser testified: "So I was just doing, you know, last checks, make sure everything's good on it and fixing that speaker, and Brouse *tries* to push me aside, and – and, you know, I tell him, "Hey I'm fixing this speaker.…" (R. 89, Tr. 2/21/23, PageID#: 3172.)

Accordingly, the proof of Sanders' and Brouse's conduct, while inappropriate, does not rise to the level of severe and pervasive sufficient to prevail on a hostile work environment claim under Sixth Circuit precedent as a matter of law.

**B. Schlosser Presented No Evidence Of Harassment Based On Her Sex.**

Schlosser's brief asserts that the "knot test," revocation of driving privileges, removal from the dive rotation, Sanders' conduct, and Brouse's conduct were all based on her gender. As discussed above, other than Sanders' and Brouse's conduct, these are discrete acts that are not properly included as supporting a hostile work environment claim. The jury already found that VRH did not discriminate against Schlosser "because of her sex or gender" related to these discrete acts, and it is inappropriate for her to attempt to re-litigate them here when she did not appeal those issues. (R. 72, Verdict Form, PageID#: 2880.) Nevertheless, VRH feels compelled to respond to the inaccuracies included in Schlosser's brief on each such issue.

**1.  The "knot test" was not based on Schlosser's sex.**

Other than claiming Schlosser "felt singled out" and no male divers were asked if they knew how to tie a knot (Schlosser Br. at 26), Schlosser points to no evidence that Scott Alogna's ("Alogna") asking her if she knew how to tie an important diving knot and asking her to practice it, was based on her sex. Indeed, Alogna testified that on that date, during dive station setup, he witnessed Schlosser with a piece of line in her hand practicing tying knots, so he went over to her and asked her if she knew how to tie a Bowline knot, to which she responded she did not. (R. 91, Tr. 2/23/21, PageID#: 3541.) He explained to her the knot and that she

6

ought to practice it because it is used extensively in diving. (*Id.*) He did not ask any other divers about tying a diving knot because he had not seen them with a piece of line practicing knots, but he has had such conversations with other employees in the past. (*Id.,* PageID#: 3542.) After that brief conversation, he later witnessed her sitting in the work truck practicing the knot instead of working with her teammates to break down the dive site, and he told her, "Now is not the time to do that. Help your teammates unload the boat." (*Id.,* PageID#: 3543.)

### 2. Schlosser's driving privileges were not revoked based on her sex.

Schlosser was restricted from driving the company vehicle in protected areas on the job site because she repeatedly got the work vehicle stuck by driving off the delineated path and into the restricted Munitions Response Site ("MRS"), which is a dangerous area that had not been cleared of UXO. (R. 91, Tr. 2/23/23, PageID#: 3634.) VRH's Chief Operating Officer ("COO"), Elliott Adler ("Adler"), witnessed Schlosser's immediate disregard of the driving directions he gave, which resulted in her driving onto the prohibited areas of the MRS and disabling the work vehicle. (*Id.*; R. 90, Tr. 2/22/23, PageID#: 3253-55.)

Alogna testified that, on another occasion, he was a passenger with Schlosser when another similar incident of Schlosser's disregard of vehicle instructions occurred and resulted in the dive team truck being stuck and unavailable. (R. 91, Tr.

2/23/23, PageID#: 3552-53; R. 90, Tr. 2/22/23, PageID#: 3482-83.) Alogna was a passenger in the truck and gave Schlosser the directions regarding the path. (*Id.*)

While Schlosser points to evidence that others also got the trucks stuck, including one instance in the MRS (Schlosser Br. at 11, 27), there is no evidence that Alogna or Adler witnessed any male employee driving a company vehicle in complete disregard of specific instructions related to safe vehicle operation on the MRS. (*Id.*)

### 3. Schlosser's removal from the dive rotation was not based on her sex.

VRH designated the Cape Poge Project as a production-based project because VRH was awarded the project on a fixed-price bid, meaning divers were required to perform a certain amount of work in a defined area on a very tight timeline. (R. 91, Tr. 2/23/23, PageID#: 3652.)

On May 26, 2016, Schlosser recovered only one anomaly in 120 minutes of dive time on her first dive, which she acknowledges "did not go as well as she [hoped]." (R. 91, Tr. 2/23/23, PageID#: 3538; R. 89, Tr. 2/21/23, PageID#: 3145.) On June 1, 2016, in connection with the verbal counseling, Adler and Alogna decided that Schlosser should be temporarily placed in the tender's role instead of diving so that she could observe and learn from her more experienced teammates.

(R. 91, Tr. 2/23/23, PageID#: 3545-46.)[1] She was told this, and that she would not be diving again until production picked up. (R. 89, Tr. 2/21/23, PageID#: 3156.)

Schlosser's brief attempts to re-litigate her discrimination claims here by using/arguing comparators and claiming she was "cited" for "having to add weight to her belt as a reason to remove her from the dive rotation moving forward." (Schlosser Br. at 28.) However, she testified that in her counseling session on June 1, 2016, there was no mention by Adler "about any concerns regarding [her] having to add weight to [her] weight belt in the first dive." (R. 89, Tr. 2/21/23, PageID#: 3237.)

A week after the June 1, 2016 counseling session, however, Adler gave her a positive counseling based on a noted improvement in her attitude and performance, and she was designated to dive again. (R. 91, Tr. 2/23/23, PageID#: 3664.) Schlosser dove on seven occasions after that positive performance review. (R. 89, Tr. 2/21/23, PageID#: 3157.)

Schlosser claims her designation for the dive rotation was "done behind management's back" and she was only given the opportunity to dive again because

---

[1] Alogna testified, "Well, having seen her performance in dressing and tending and diving, we felt she would gain more experience onshore learning procedures and equipment and steps before she got back in the water." (R. 90, Tr. 2/22/23, PageID#: 3476.)

9

her co-workers made the decision to let her dive. (Schlosser Br. at 28-29.) Her testimony at trial was that her co-worker, Ben Roberts ("Roberts"), got her back in the water. (R. 89, Tr. 2/21/23, PageID#: 3156, 3192.) However, she later admitted that Roberts did not make decisions as to who dove and said the dive supervisor allowed her to dive. (R. 90, Tr. 2/22/23, PageID#: 3333.) Moreover, Alogna testified that she was not diving behind his back because the daily dive logs indicated who dove. (R. 91, Tr. 2/23/23, PageID#: 3546.) Her testimony is further contradicted by a July 24, 2024 e-mail from the Project Manager, Ron Madden ("Madden"), which she introduced as trial Exhibit 19, stating: "After some time went by and the project smoothed out, things were in a routine and production numbers were up by using the most productive divers, that she could dive on occasion to see if she could improve. …" (Schlosser App'x, July 24, 2016 email, App'x_0042.)

The project was often behind schedule regarding the time for VRH's performance due to challenges regarding the amount of UXO recovered, bad weather delays and other subcontractor delays, for which VRH management constantly had to switch divers to increase UXO recoveries in the remaining project time. (R. 91, Tr. 2/23/23, PageID#: 3594; R. 92, Tr. 2/27/23, PageID#: 3797.)

Due to such delays, on July 24, 2016, Madden sent an e-mail, which reiterated his and Adler's previous instruction that the most productive divers were to be

10

designated as primary and secondary divers. (Schlosser App'x, July 24, 2016 email, App'x_0042.) With respect to Schlosser, the e-mail said, in pertinent part, "From what I see in the logs, and us having just lost three days of production, I don't want her diving for at least the next two weeks." (*Id.*)

Schlosser's brief argues that she was not the *least* productive diver, and again, attempts to relitigate her discrimination claim by using comparators. (Schlosser Br. at 30.) At trial, Madden acknowledged that Ben Roberts was the least productive diver and that he should not have called out Schlosser directly, but also noted that she was not among the most productive divers, which are the divers he wanted in the water. (R. 92, Tr. 2/27/23, PageID#: 3729.) Ultimately, however, the jury concluded that this did not constitute discrimination based on Schlosser's sex. And even if VRH was mistaken that Schlosser was the least productive diver, that does mean its decision was based on her gender. *Cf. Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001) (under the "honest belief" rule, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.").

11

### 4. There was no evidence that Sanders' conduct was based on Schlosser's sex.

Without support from the record, Schlosser's brief asserts that Sanders made "statements suggesting an anti-female animus." (Schlosser Br. at 26) (citing R. 89, Tr. 2/21/23, PageID#: 3155.) On the contrary, the cited testimony from Schlosser indicates that Sanders' issues stemmed from his opinion of her diving capabilities: "[H]e said basically … that my best plan of action … was that … I just stop talking, because he said I'm not a real diver, I've never worked a real job, my opinion doesn't matter, I need to keep my head down, shut the F up." (*Id.*) Schlosser even acknowledged that she had not worked as a UXO diver prior to this job with VRH. (R. 89, Tr. 2/21/23, PageID#: 3225.) She also admitted that there were "instances of friction" between her and Sanders in the context of "pretty heated discussions with Sanders about dive capabilities and what diving was." (R. 89, Tr. 2/21/23, PageID#: 3240-41.)

There is not a single shred of evidence in the record indicating any of Sanders' comments or conduct was based on Schlosser's gender. If there were, she would have surely testified about it and would have quoted it in her brief. Instead, she argues that Adler testified: "Sanders did not treat his male counterparts the same way" and that "Schlosser's teammates supported her claim that Mr. Sanders singled her out and treated her differently." (Schlosser Br. at 27.) Adler's testimony,

however, was that he was "unaware of [Sanders] having any friction with any other employees he lived with, but it's possible," (R. 91, Tr. 2/23/23, PageID#: 3591), and that two of the teammates thought "Mr. Sanders was being unduly harsh on Ms. Schlosser." (*Id.*, PageID#: 3616.)

Adler further testified as follows:

Q: As a result of your investigation, you interviewed other employees, and did you form an opinion of whether the alleged harassing conduct that Mr. Sanders was accused of --did you form an opinion as to whether that -- his conduct was motivated by the plaintiff's sex or her gender?

A: At no point did he make any commentary with regard
 to that. I believe that we may have asked him that, although I don't have a specific recollection of it, although clearly since there were two genders at play.

Q: What was your opinion as a result of interviewing him or interviewing any of the other witnesses with respect to that?

A: No one offered any testimony about it being gender-related. Both Mr. Prince and Mr. Watts –

(*Id.*, PageID #: 3671.)

Accordingly, Schlosser offered no evidence from which a reasonable jury could conclude that Sanders' conduct was based on her sex.

13

**II.    VRH Cannot be Liable for a Hostile Work Environment by Sanders Under the Faragher/Ellerth Affirmative Defense.**

    **A. Sanders' Conduct Did Not Culminate in a Tangible Employment Action Against Her.**

Schlosser argues that VRH is not entitled to the Faragher/Ellerth Affirmative Defense due to: (1) her removal from the dive rotation; (2) Sanders threatened her job; (3) she was transferred to a different dive team; and (4) she was "constructively discharged." (Schlosser Br. at 33-34.) Each of these arguments is without merit.

"If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 412 (6th Cir. 2021) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424, (2013)). But if the harassment does not result in a tangible employment action, "the employer may escape liability by establishing" an affirmative defense under the *Faragher-Ellerth* framework. *Id.* Thus, "the affirmative defense implicitly requires a causal link between the alleged harassment and the tangible employment action." *Syed v. N. Kentucky Water Dist.*, No. CIV.A. 08-197-DLB, 2010 WL 1235330, at *7 (E.D. Ky. Mar. 23, 2010); *see also Lissau v. S. Food Serv., Inc.,* 159 F.3d 177, 182 (4th Cir. 1998) (noting that if plaintiff's termination did not "result from" a refusal to submit to a supervisor's sexual harassment, the employer may assert the *Faragher/Ellerth* affirmative defense); *Ferraro v. Kellwood Co.,* 440 F.3d 96, 102 (2d Cir. 2006)

("The word 'culminate' requires that the tangible employment action be linked to the supervisor's discriminatory harassment."); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959-60 (8th Cir. 2004) (noting that even if a tangible employment action occurred, the employer may still assert the affirmative defense if the tangible employment action is "unrelated to" the alleged harassment).

First, Schlosser was initially removed from the dive rotation by Adler on June 1, 2016, not by Sanders. (R. 89, Tr. 2/21/23, PageID#: 3156; R. 91, Tr. 2/23/23, PageID#: 3545-46.) A week later, she was cleared by Adler to dive again, and dove on seven occasions, including while Sanders was her supervisor. (R. 91, Tr. 2/23/23, PageID#: 3664; R. 89, Tr. 2/21/23, PageID#: 3157.) On June 17, 2016, she was switched off of Sanders' team, and he, therefore, could no longer affect whether she dove. (R. 91, Tr. 2/23/23, PageID#: 3613-14.) There was no proof at trial of any further "harassment" by Sanders subsequent to the remedial steps by VRH to protect her. (R. 90, Tr. 2/22/23, PageID#: 3266-68, 3319-20, 3409-10, 3421.)

The proof at trial established that the harassment did not *culminate* in a tangible employment action, which Schlosser verified with her June 24, 2016 e-mail to VRH:

> All issues have been solved swiftly and with great haste. VRHabilis has gone above and beyond to address and alleviate all concerns on my behalf. I am grateful to everyone involved in quickly and efficiently

15

addressing the situation. I am relieved and more than satisfied with the
end result. Thank you.

(R. 90, Tr. 2/22/23, PageID#: 3409; VRH Appx., Def.'s Trial Ex. 9, Appx_000030.)

Second, threatening Schlosser's job is not a tangible employment action. *See
Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998) ("A tangible
employment action constitutes significant change in employment status, such as
hiring, firing, failing to promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in benefits."). The
undisputed facts are that Sanders did not terminate Schlosser, and that she resigned
of her own accord. (VRH Appx., Def.'s Ex. 27, Appx_000031-33; R. 90, Tr.
2/22/23, PageID#: 3420.)

Third, switching teams is not a tangible employment action because there is
no evidence in the record that the reassignment had "significantly different
responsibilities" or caused "a significant change in benefits." *See Ellerth,* 524 U.S.
at 761.

Finally, Schlosser's retaliation claim was based solely on her alleged
constructive discharge. Count III of her Complaint alleges:

133. Plaintiff engaged in protected activity under Title VII by
complaining about sex discrimination to her superiors and Defendant's
human resources department.

16

134. Defendant took adverse employment actions against the Plaintiff in constructively discharging her from employment.

135. Pursuant to 42 U.S.C. § 2000e-3, Plaintiff was entitled to engage in and assert protected activities and rights without retaliation.

136. A causal link exists between Plaintiff engaging in protected activity and her constructive discharge.

(R. 1, Compl. ¶¶ 132-136, PageID#: 13.) The jury found that she failed to prove her retaliation claim by a preponderance of the evidence. (R. 72, Verdict, PageID#: 2881.) Moreover, Schlosser testified at trial that as a result of the actions VRH took with respect to Sanders, "those confrontations were able to cease." (R. 90, Tr. 2/22/23, PageID#: 3267-68.) Those remedial actions were taken June 17, 2016, and her resignation was on July 28, 2016. Accordingly, Sanders' actions did not culminate in a tangible employment action, and VRH is entitled to the affirmative defense.

### B. Schlosser Unreasonably Failed To Take Advantage Of The Corrective Opportunities Provided By VRH To Avoid Harm.

Importantly, Schlosser's brief does not contest that VRH had a reasonable and effective sexual harassment policy to prevent, stop, and address harassment. Instead, she deflects from her own failures and criticizes the investigation that VRH undertook to protect her by calling it a "sham investigation." (Schlosser Br. at 43.)

Specifically, she takes issue with the fact that the COO, Adler, conducted an on-site investigation and that the Human Resources Manager, Diane Backes ("Backes"), did not personally fly to Massachusetts to conduct the on-site investigation. (*Id.* at 44.) Somehow Schlosser argues that Backes did not investigate any of Schlosser's claims, while completely ignoring Backes' repeated requests for specific information about her complaint. Backes sent Schlosser an email the same morning of her complaint, June 17, 2016, stating: "As I start the investigative process I will need your assistance to address your concerns. I will need details of exactly what was said or done, when, and where and who else was there. I can be available to talk to you, let me know and we can set up a time.…" (R. 90, Tr. 2/22/23, PageID#: 3405-06; VRH Appx., Def.'s Trial Ex. 9, Appx_000027.) Schlosser failed to respond to this e-mail, and further failed to respond to Backes' two additional requests for information on June 20 and 21, 2016. (R. 90, Tr. 2/22/23, PageID#: 3406-11; VRH Appx., Def.'s Trial Ex. 9, Appx_000027-29.) Schlosser's failure to respond to Backes' numerous requests and attempt to investigate establishes the second element of the *Faragher/Ellerth* affirmative defense.

### C. VRH Took Prompt, Effective Remedial Action That Eliminated Any Further Harassment By Sanders.

Schlosser's brief ignores that VRH's investigation of her complaint about Sanders was prompt and that the company took effective remedial action that

resulted in a cessation of any further verbal harassment by Sanders. Indeed, the day Schlosser made her complaint, June 17, 2016, Adler immediately shut down diving operations on the job site and directed that Schlosser and Sanders be separated by switching her diving team supervisor to John Bigos ("Bigos"), and a male diver was simultaneously sent to Sanders' team. (R. 91, Tr. 2/23/23, PageID#: 3613-14; R. 90, Tr. 2/22/23, PageID#: 3259-60, 3409-10.)

Adler promptly travelled to the project site that weekend, interviewed witnesses, and reported the results to Schlosser. (R. 91, Tr. 2/23/23, PageID#: 3669-73; R. 89, Tr. 2/21/23, PageID#: 3158-59.) Additionally, the Company's remedial actions included switching Sanders' lodging out of the communal house that Schlosser, other divers, and Sanders were living in to protect her from any further inappropriate conduct. (R. 91, Tr. 2/23/23, PageID#: 3591.) After determining that Schlosser's complaint about Sanders' verbal conduct was valid, Adler gave Sanders corrective counseling and let him know "per our human resources manual and employee handbook, that, yes, any subsequent complaint or activity such as this -- such as this activity would be dealt with swiftly and harshly." (R. 91, Tr. 2/23/23, PageID#: 3680.)

There was no proof at trial of any further "harassment" by Sanders subsequent to these remedial steps by Adler and Backes. (R. 90, Tr. 2/22/23, PageID#: 3266-68, 3319-20, 3409-10, 3421.)

Schlosser acknowledged the effectiveness of these actions through her June 24, 2016 email to Backes:

> All issues have been solved swiftly and with great haste. VRHabilis has gone above and beyond to address and alleviate all concerns on my behalf. I am grateful to everyone involved in quickly and efficiently addressing the situation. I am relieved and more than satisfied with the end result. Thank you.

(R. 90, Tr. 2/22/23, PageID#: 3409; VRH Appx., Def.'s Trial Ex. 9, Appx_000030.)

Schlosser's brief wrongly asserts that Adler "acknowledged the investigation was related to sex/gender-based harassment." (Schlosser Br. at 38.) Adler's testimony on the point, however, was as follows:

> Q: During your time with VRHabilis, how many sexual harassment investigations you have conducted?
> A: None. Well, I mean, one.
> Q: Which one?
> A: The June 17th complaint of Ms. Schlosser.
> Q: During your deposition you testified that you've never had a sexual harassment complaint against an individual in the field.
> A: I didn't have a clear understanding of the law, that gender discrimination can also fall under the heading of sexual discrimination. So …
> Q So do you agree that treating a person differently because of their gender is discrimination?
> A Yes.

20

(Schlosser Br. at 5.) As a lay witness, who is not an attorney and has since been involved with a sex/gender-based harassment lawsuit related to that very investigation, Adler cannot be expected to know the intricacies of specific legal terminology. Indeed, Schlosser's June 17, 2017 e-mail complaining about Sanders did not contain a single mention of sexual harassment or harassment based on her gender. Instead, it stated:

> I am writing to you an official report of what I feel to be recurrent harassment by my superior.
>
> I recently reported this to the highest ranking person on the ground out here, yet nothing has been acknowledged on my behalf and no actions are being taken to resolve the issue other than an apparent threat on my job.
>
> I felt it necessary for my assurance that I send this directly to you to be documented.
>
> No action is necessarily needed, other than a stop to my daily verbal abuse. Once that ends, I have full confidence that my superior, Tyler Sanders and I, will be able to work together peacefully, respectfully, productively and without fault from here on out.

(VRH Appx., Def.'s Trial Ex. 9, Appx_000028; R. 89, PageID#: 3160.)

Moreover, Adler further testified as follows:

> Q: As a result of your investigation, you interviewed other employees, and did you form an opinion of whether the alleged harassing conduct that Mr. Sanders was accused of --did you form an opinion as to whether that -- his conduct was motivated by the plaintiff's sex or her gender?

21

A: At no point did he make any commentary with regard
to that. I believe that we may have asked him that, although I don't have
a specific recollection of it, although clearly since there were two
genders at play.

Q: What was your opinion as a result of interviewing him or
interviewing any of the other witnesses with respect to that?

A: No one offered any testimony about it being gender-related. Both
Mr. Prince and Mr. Watts –

(R. 91, Tr. 2/23/23, PageID #: 3671.)

Schlosser also incorrectly asserts that she was switched to the other dive team

based on Sanders' request. (Schlosser Br. at 45.) Adler denied that and testified that

he was not aware of any request by Sanders to move her off his team at the time he

made the decision. (*Id.*, PageID#: 3681.) Moreover, such an argument ignores the

fact that Schlosser was not switched off of Sanders' dive team until the morning of

June 17, 2016, immediately after she made her June 17, 2016 complaint. (R. 91, Tr.

2/23/23, PageID#: 3613-14; R. 90, Tr. 2/22/23, PageID#: 3259-60, 3409-10.)

Finally, Schlosser argues this case is analogous to the case of *West v. Tyson

Foods, Inc.,* 374 F. App'x 624 (6th Cir. 2010). (Schlosser Br. at 39.) But *West* is only

analogous here if the facts of *West* are ignored. In *West,* a female employee at Tyson

foods was repeatedly harassed by coworkers, who told her she had a "nice ass," "big

boobs," asked her if she had a boyfriend, and asked her to "go" with them. *Id.* at 627.

She was also subject to frequent "wolf whistling" and staring. *Id.* These incidents

22

occurred approximately ten to fifteen times per shift. *Id.* One coworker tried to kiss her, asked her to have sex with him, grabbed his private part and said "suck my d***." *Id.* When she told two supervisors about this conduct, they told her, "don't take it offensive; that's just how they treat their women over there," and then "well, you know, you are hot." *Id.* They then told her that they would resolve it, and asked her not go to HR. *Id.* The "only response was to move [the plaintiff] to a different place on the processing floor, and, possibly, to watch her occasionally for the next few days." *Id.* at 633.

Nevertheless, the comments, stares, wolf whistles, continued with the same frequency for the five weeks she was employed there. And after her complaint, another employee pulled her back into him and touched her breast, told her she was "hot and sexy," and groped her buttocks twice. *Id.* at 627. As noted by this Court in *West*, "[t]he appropriate corrective response will vary according to the severity and persistence of the alleged harassment." *Id.* at 633. The response in *West* was woefully insufficient because the harassment continued. Conversely, in the instant case, Schlosser testified at trial that as a result of the actions VRH took with respect to Sanders, "those confrontations were able to cease." (R. 90, Tr. 2/22/23, PageID#: 3267-68.) Accordingly, VRH's actions were sufficient to stop the harassment. *See also Harris v. Sodders,* No. 07-4398, 2009 WL 331633, at *2 (6th Cir. Feb. 11, 2009)

(holding that action of moving harasser to a different department where they no longer worked together and the harassment ceased was appropriate).

Based on the foregoing, no reasonable jury could conclude that VRH conducted a "sham" investigation or took actions which were not reasonably calculated to end the harassment.

### D. Schlosser failed to offer sufficient evidence at trial that VRH "knew or should have known" of the alleged harassment by Brouse and did not take corrective action.

Schlosser's brief ignores the undisputed facts that she (1) never reported the issues with Brouse as harassment; (2) did not submit a written statement on the first incident when requested to do so; (3) "felt it was an off hours issue"; and (4) "did not wish to pursue this matter with anyone outside the team." (R. 90, Tr. 2/22/23, PageID#: 3256, 3321-23, 3409; R. 91, Tr. 2/23/23, PageID#: 3590-91; VRH Appx., Def.'s Trial Ex. 29, Appx_000034.) Such actions by Schlosser prevented VRHabilis from undertaking enforcement of its policies to protect her from unwelcome harassment and are inconsistent with her claims at trial of "severe and pervasive harassment." (R. 90, Tr. 2/22/23, PageID#: 3422.)

Schlosser attempts to avoid these facts by arguing red-herrings that have no material bearing on her material failures as noted. First, she argues Paul Baril ("Baril") was not trained in human resources. This ignores that he intervened in the

confrontation between Schlosser and Brouse, offered to separate them by switching team members around, requested a statement from both parties—which Schlosser unreasonably refused to provide, told both employees it would not be tolerated, and forwarded the information to the HR Manager Backes. (R. 90, Tr. 2/22/23, PageID#: 3321-3322, 3326, 3411-3413 168:9-170:18, 175:15-22; VRH Appx., Def.'s Trial Ex. 29, Appx_000034.)

Accordingly, VRH told both employees it would not be tolerated and attempted to separate them, but Schlosser pleaded for Baril not to do so. Each of these steps is in line with "reasonably appropriate corrective action" announced in *Waldo,* 726 F.3d at 814 ("promptly initiating an investigation[,] ... 'speaking with the specific individuals identified'" in the complaint, "following up with the complainant," and "reporting the harassment to others in management."). Therefore, Schlosser herself unreasonably failed to take advantage of the procedures and corrective actions offered by the Company, and judgment should be entered as a matter of law in Defendant's favor.

Second, Schlosser claims she did not write a statement because "she didn't want to be the blame for production, which would again make her the problem." (Schlosser Br. at 35.) But it is unclear how writing a statement detailing her side of the story when she felt she was being harassed would stop production.

Third, Schlosser's brief asserts she witnessed Baril and Brouse "'smoking and joking' prior to asking her to write a statement." (*Id.*) But her testimony at trial reflects that this occurred *after* she was asked to write a statement: "they were smoking-and-joking the *rest of the day.*" (R. 89, Tr. 2/22/23, PageID#: 3327.)

Fourth, Schlosser points to the fact that Baril's email "painted Ms. Schlosser as the aggressor." (Schlosser Br. at 36.) Nevertheless, she had the opportunity to submit her side of the story and unreasonably failed to do so at the time. Moreover, Schlosser's testimony at trial was that she took "the PFD, I throw it back in the truck.… And he gets upset again, because he's accusing me of throwing it at him, which you know, that's kind of reaching, but okay." (R. 89, Tr. 2/21/23, PageID#: 3174.) This aligns with Brouse's written statement, which states: "I sat down on the tail gate to observe the diver at that point she threw the life jacket at me which missed and flew into the bed of the truck. At this time I notified Paul and decided to cease speaking to her on this issue." (VRH Appx., Def.'s Trial Ex. 29, Appx_000035-36; R. 90, Tr. 2/22/23, PageID#: 3418.)

Finally, Schlosser's brief argues that she testified the abuse continued on a "daily basis." (Schlosser Br. at 36.) But the context of the cited testimony is that this was a statement from her resignation email. (R. 90, Tr. 2/22/23, PageID#: 3331.) Her testimony at trial was that there only three incidents with Brouse, and these

occurred over the course of approximately 10 days. (R. 89, Tr. 2/21/23, PageID#: 3172, 3173-74, 3176-78.)

Therefore, a reasonable jury could not find that Schlosser reasonably took advantage of the procedures and corrective actions offered by the Company, and judgment should be entered as a matter of law in VRH's favor.

### E. VRH Attempted to Contact Schlosser After her Resignation.

Schlosser's arguments related to an investigation after her resignation are another red-herring. First, Schlosser incorrectly asserts that Backes did not follow-up with her about the allegations in her resignation. (Schlosser Br. at 41.) But at trial, Schlosser testified:

> Q: Did Ms. Backes ever call you after you submitted your resignation?
>
> A: I believe at some point I received a call from Diane and Ron, but I didn't have any service at the time, so it didn't go through. And I didn't get a message or anything else after that. It was just the e-mail correspondence.

(R. 89, Tr. 2/21/22, PageID#: 3192.)

Second, Schlosser asserts that Adler "felt relieved when Ms. Schlosser resigned, and it was one less problem to deal with." (*Id.* at 42.) Adler's testimony, however, was that his emotional reaction was that "[i]t was confusing to me . . ." and "relief" was one of the feelings that he said felt at his deposition, but that it "was not

27

accurate reflection of what [he] was trying to convey." (R. 91, Tr. 2/23/22, PageID#: 3625-27.)

Finally, Schlosser asserts that VRH did not investigate any of her allegations in the resignation email. (Schlosser Br. at 41.) However, the majority of her allegations were for the discrete acts for which the jury found VRH was not liable. Moreover, the allegations related to Sanders had already been investigated.

## CONCLUSION

For each and all of the foregoing reasons, VRHabilis, LLC respectfully submits that this Honorable Court should reverse and render judgment in favor of VRHabilis, LLC.

Respectfully submitted this 5th day of April, 2024.

s/Bryce E. Fitzgerald
George R. Arrants, Jr., TN BPR #012555
Bryce E. Fitzgerald, TN BPR #033289
KRAMER RAYSON LLP
P. O. Box 629
Knoxville, TN 37901-0629
(865) 525-5134
garrants@kramer-rayson.com
bfitzgerald@kramer-rayson.com

*Attorneys for Appellant VRHabilis, LLC*

## CERTIFICATE OF COMPLIANCE

1.      This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,306 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and the parts of the Brief exempted by Sixth Circuit Rule 32(b).

2.      This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the Brief has been produced in a proportionally spaced typeface using Microsoft Word for Microsoft 365 Times New Roman 14 point typeface.


                                        s/Bryce E. Fitzgerald
                                        Bryce E. Fitzgerald

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of April, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may gain access to this filing through the Court's electronic filing system.


s/Bryce E. Fitzgerald
Bryce E. Fitzgerald

30